McKESSON CORPORATION *v.* DIVISION OF ALCO-
HOLIC BEVERAGES AND TOBACCO, DEPARTMENT
OF BUSINESS REGULATION OF FLORIDA, ET AL.

No. 88–192. Argued March 22, 1989—Reargued December 6, 1989—
Decided June 4, 1990

BRENNAN, J., delivered the opinion for a unanimous Court.

*David G. Robertson* reargued the cause for petitioner. With him on the briefs was *Walter Hellerstein.*

*H. Bartow Farr III* reargued the cause for respondents. With him on the briefs were *Robert A. Butterworth*, Attorney General of Florida, *Joseph C. Mellichamp III*, Assistant Attorney General, and *Daniel C. Brown*, Special Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the Crow Tribe of Indians by *Daniel M. Rosenfelt;* for the American Trucking Associations, Inc., et al. by *Andrew L. Frey, Kenneth S. Geller, Mark I. Levy, Andrew J. Pincus, Peter G. Kumpe, Daniel R. Barney, Robert Digges, Jr., Laurie T. Baulig,* and *William S. Busker;* for the Committee on State Taxation of the Council of State Chambers of Commerce by *Jean A. Walker* and *William D. Peltz;* for the Tax Executives Institute, Inc., by *Timothy J. McCormally;* and for U. S. Oil & Refining Co. by *Franklin G. Dinces.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp*, Attorney General of California, and *Richard F. Finn*, Supervising Deputy Attorney General, *Eric J. Coffill, Jim Jones*, Attorney General of Idaho, *Marc Racicot*, Attorney General of Montana, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Jim Mattox*, Attorney General of Texas, *R. Paul Van Dam*, Attorney General of Utah, *Robert K. Corbin*, Attorney General of Arizona, *Warren Price III*, Attorney General of Hawaii, *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Herbert O. Reid, Sr.*, Acting Corporation Counsel of the District of Columbia; for the State of Georgia et al. by *Mary Sue Terry*, Attorney General of Virginia, *H. Lane Kneedler*, Chief Deputy Attorney General, and *Walter A. McFarlane*, Deputy Attorney General, and by the

JUSTICE BRENNAN delivered the opinion of the Court.

Petitioner McKesson Corporation brought this action in Florida state court, alleging that Florida's liquor excise tax violated the Commerce Clause of the United States Constitution. The Florida Supreme Court agreed with petitioner that the tax scheme unconstitutionally discriminated against interstate commerce because it provided preferences for distributors of certain local products. Although the court enjoined the State from giving effect to those preferences in the future, the court also refused to provide petitioner a refund or any other form of relief for taxes it had already paid.

Our precedents establish that if a State penalizes taxpayers for failure to remit their taxes in timely fashion, thus requiring them to pay first and obtain review of the tax's validity later in a refund action, the Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional. We therefore agree with petitioner that the state court's decision denying such relief must be reversed.

I

For several decades until 1985, Florida's liquor excise tax scheme, which imposes taxes on manufacturers, distributors, and in some cases vendors of alcoholic beverages, provided

---

Attorneys General for their respective jurisdictions as follows: *Michael J. Bowers* of Georgia, *William J. Guste, Jr.*, of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Frank J. Kelley* of Michigan, *Michael Moore* of Mississippi, *Robert M. Spire* of Nebraska, *Brian McKay* of Nevada, *John P. Arnold* of New Hampshire, *Peter N. Perretti, Jr.*, of New Jersey, *Lacy H. Thornburg* of North Carolina, *Robert H. Henry* of Oklahoma, *Dave Frohnmayer* of Oregon, *T. Travis Medlock* of South Carolina, *Roger A. Tellinghuisen* of South Dakota, *Charles W. Burson* of Tennessee, *R. Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, and *Godfrey R. de Castro* of the Virgin Islands; for Caterpillar Inc. by *Don S. Harnack;* and for the National Conference of State Legislatures et al. by *Benna Ruth Solomon* and *Charles Rothfeld.*

for preferential treatment of beverages that were manufactured from certain "Florida-grown" citrus and other agricultural crops and then bottled in state. See, *e. g.*, Fla. Stat. §§ 564.02, 564.06, 565.12, 565.14 (1983). After this Court held in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), that a similar preference scheme employed by the State of Hawaii violated the Commerce Clause[1] (because it had both the purpose and effect of discriminating in favor of local products), the Florida Legislature revised its excise tax scheme and enacted the statutory provisions at issue in this litigation. See Fla. Stat. §§ 564.06, 565.12 (1989) (hereafter Liquor Tax). The legislature deleted the previous express preferences for "Florida-grown" products and replaced them with special rate reductions for certain specified citrus, grape, and sugarcane products, all of which are commonly grown in Florida and used in alcoholic beverages produced there.[2]

Petitioner McKesson Corporation is a licensed wholesale distributor of alcoholic beverages whose products did not qualify for the rate reductions.[3] Petitioner paid the appli-

---

[1] "The Congress shall have Power . . . To regulate Commerce . . . among the several States." U. S. Const., Art. I, § 8, cl. 3.

[2] Under the Liquor Tax, the tax rate for each of several categories of preferred products is calculated according to a sliding scale. The rate varies directly with the total volume of such products sold by all distributors during the preceding month. If the volume of preferred products sold within any category is low, the tax rate is very favorable compared to the generally applicable rate for nonpreferred products. Conversely, at a relatively high volume of sales, the tax rate for preferred products equals the nonpreferred rate.

The Liquor Tax also contains "retaliation" provisions which declare that the rate reductions applicable to the preferred products do not apply when they are imported from a State that imposes discriminatory taxes or provides agricultural price supports or export subsidies benefiting its own locally produced alcoholic beverages. Fla. Stat. §§ 564.06(9), 565.12(1)(c), 565.12(2)(c) (1989).

[3] Florida law divides traffic in alcoholic beverages into three tiers: (1) manufacture or importation; (2) wholesale distribution; and (3) retail sales. § 561.14. Manufacturers may not sell directly to retail dealers, and dis-

cable taxes every month as required after the revised Liquor Tax went into effect, but in June 1986, petitioner filed an application with the Florida Office of the Comptroller seeking a refund on the ground that the tax scheme was unlawful. In September, after the Comptroller denied its application, petitioner (along with other distributors not present here) brought suit in Florida state court against respondents Division of Alcoholic Beverages and Tobacco, Department of Business Regulation, and Office of the Comptroller. Petitioner challenged the constitutionality of the tax under the Commerce Clause as well as under various other provisions of the United States and Florida Constitutions, and petitioner sought both declaratory and injunctive relief against the continued enforcement of the discriminatory tax scheme. Pursuant to Florida's "Repayment of Funds" statute, which provides for a refund of "[a]n overpayment of any tax, license or account due" and "[a]ny payment made into the State Treasury in error," §§ 215.26(1)(a), (c), and in apparent compliance with the statutory requisites for preserving a claim thereunder,[4] petitioner also sought a refund in the amount of

tributors therefore serve as necessary intermediaries. The State places the legal incidence of the excise taxes on distributors, who must remit the taxes monthly. Distributors may choose to sell beverage products receiving the tax preferences, nonpreferred products, or both. §§ 561.50, 561.506, 565.13.

[4] The record is unclear whether and how, prior to petitioner's refund application to the Comptroller in September 1986, petitioner protested its tax payments or otherwise put the State on notice of its position that the Liquor Tax was unconstitutional. It appears, however, that Florida law does not require a taxpayer to pay under protest in order to preserve the right to challenge a remittance in a postpayment refund action, as long as the action is initiated within the applicable limitations period. See § 215.26 (2) (generally applicable 3-year limitations period for refund actions containing no protest requirement); *Miami* v. *Florida Retail Federation, Inc.,* 423 So. 2d 991, 993 (Fla. App. 1982) ("[T]he involuntary payment of an invalid tax, which has been promulgated without an authorized procedure for protest, presents no bar to recovery by a taxpayer who has paid without protest"). We assume for present purposes that petitioner satisfied

the excess taxes it had paid as a result of its disfavored treatment.

On petitioner's motion for partial summary judgment, the Florida trial court invalidated the discriminatory tax scheme on Commerce Clause grounds because the revised "legislation failed to surmount the constitutional violations addressed in *Bacchus [Imports, supra]*." App. 263. The trial court enjoined future enforcement of the preferential rate reductions, leaving all distributors subject to the Liquor Tax's nonpreferred rates. The court, however, declined to order a refund or any other form of relief for the taxes previously paid and timely challenged under the discriminatory scheme. The court's order of prospective relief was stayed pending respondents' appeal of the Commerce Clause ruling to the Florida Supreme Court.[5]

Petitioner McKesson cross-appealed the trial court's ruling, arguing that as a matter of both federal and state law it was entitled at least to "a refund of the difference between the disfavored product's tax rate and the favored product's tax rate." 524 So. 2d 1000, 1009 (1988). The State Supreme

whatever protest requirements might exist, though as we explain, *infra*, at 45, upon remand the State may invoke, as an independent basis for refusing to provide a refund, petitioner's failure to comply with a notice requirement that was in effect at the time of petitioner's tax payments.

[5] The appeal and cross-appeal were certified directly to the Florida Supreme Court by the District Court of Appeal.

The State's immediate filing of its Notice of Appeal automatically stayed the trial court's order. Fla. Rule App. Proc. 9.310(b)(2). Petitioner requested the trial court to vacate the stay, arguing that continued enforcement of the unconstitutional tax scheme pending State Supreme Court review would continue to expose Florida's treasury to claims for tax refunds. After a hearing, the trial court denied the motion. Pending the State Supreme Court's final decision, therefore, respondents continued to collect taxes under the Liquor Tax with the unconstitutional preferences still in effect.

Hence, in this case petitioner contests the validity of the taxes it paid from July 1985 until the State Supreme Court's final decision was given effect in February 1988 (the contested tax period).

Court affirmed the trial court's ruling that the Liquor Tax unconstitutionally discriminated against interstate commerce and upheld the trial court's order that the preferential rate reductions be given no future operative effect. The Supreme Court also affirmed the trial court's refusal to order a tax refund, declaring that "the prospective nature of the rulings below was proper in light of the equitable considerations present in this case." *Id.*, at 1010. The court noted that the Division of Alcoholic Beverages and Tobacco had collected the Liquor Tax in "good faith reliance on a presumptively valid statute." *Ibid.* Moreover, the court suggested that, "if given a refund, [petitioner] would in all probability receive a windfall, since the cost of the tax has likely been passed on to [its] customers." *Ibid.*

After petitioner's request for rehearing was denied, petitioner filed a petition for writ of certiorari in this Court, presenting the question whether federal law entitles it to a partial tax refund. We granted the petition, 488 U. S. 954 (1988), and consolidated the case with *American Trucking Assns., Inc.* v. *Smith*, No. 88–325, which we also decide today.[6] *Post*, p. 167.

## II

Respondents first ask us to hold that, though the Florida courts accepted jurisdiction over this suit which sought monetary relief from various state entities, the Eleventh Amendment[7] nevertheless precludes our exercise of appellate jurisdiction in this case. We reject respondents' suggestion. Almost 170 years ago, Chief Justice Marshall, writing for the Court, rejected a State's Eleventh Amendment challenge to

---

[6] Both cases were argued in October Term 1988 and then reargued in October Term 1989 after supplemental briefing was requested. 492 U. S. 915 (1989).

[7] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U. S. Const., Amdt. 11.

this Court's power on writ of error to review the judgment of a state court involving an issue of federal law. See *Cohens* v. *Virginia*, 6 Wheat. 264, 412 (1821). Although *Cohens* involved a proceeding commenced in the first instance by the State itself against a citizen, such that the Court's holding might be read as limited to that circumstance, the decision has long been understood as supporting a broader proposition: "[I]t was long ago settled that a writ of error to review the final judgment of a state court, even when a State is a formal party [defendant] and is successful in the inferior court, is not a suit within the meaning of the Amendment." *General Oil Co.* v. *Crain*, 209 U. S. 211, 233 (1908) (Harlan, J., concurring); see also *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 585 (1837) (Story, J., dissenting). Our consistent practice since *Cohens* confirms this broader understanding. We have repeatedly and without question accepted jurisdiction to review issues of federal law arising in suits brought against States in state court; indeed, we frequently have entertained cases analogous to this one, where a taxpayer who had brought a refund action in state court against the State asked us to reverse an adverse state judicial decision premised upon federal law.[8]

---

[8] See, *e. g.*, *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989); *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232 (1987); *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221 (1987); *Williams* v. *Vermont*, 472 U. S. 14 (1985); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984); *Aloha Airlines, Inc.* v. *Director of Taxation of Hawaii*, 464 U. S. 7 (1983); *Exxon Corp.* v. *Eagerton*, 462 U. S. 176 (1983); *Central Machinery Co.* v. *Arizona Tax Comm'n*, 448 U. S. 160 (1980); *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980); *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64 (1963); *Laurens Federal Savings & Loan Assn.* v. *South Carolina Tax Comm'n*, 365 U. S. 517 (1961); *Memphis Steam Laundry Cleaner, Inc.* v. *Stone*, 342 U. S. 389 (1952); *Best & Co.* v. *Maxwell*, 311 U. S. 454 (1940); *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239 (1931); *International Paper Co.* v. *Massachusetts*, 246 U. S. 135 (1918); *State Tonnage Tax Cases*, 12 Wall. 204 (1871); cf. *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S.

Respondents correctly note that, since *Cohens*, the effect of the Eleventh Amendment on this Court's appellate jurisdiction over cases arising in state court has only infrequently been discussed in our cases. But those discussions uniformly reveal an understanding that the Amendment does not circumscribe our appellate review of state-court judgments.[9] Moreover, that this Court has had little occasion to discuss the issue merely reflects the extent to which States, though frequently interjecting Eleventh Amendment objections to suits initiated against them in federal court, have understood the time-honored practice of appellate review of state-court judgments to be consistent with this Court's role in our federal system. "[I]t is plain that the framers of the constitution did contemplate that cases within the judicial cognizance of the United States not only might but would arise in the state courts, in the exercise of their ordinary jurisdiction." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 340 (1816).[10] To

707 (1981) (reversing state-court decision against claimant in suit against state entity seeking payment of unemployment benefits); *Bonelli Cattle Co.* v. *Arizona*, 414 U. S. 313 (1973) (reversing state-court decision against claimant in suit against State seeking to quiet title).

[9] In several recent cases, we have exercised appellate jurisdiction to review issues of federal law arising in suits brought against States or state entities in state court even after noting that the Eleventh Amendment would have precluded federal jurisdiction as an original matter. See, e. g., *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65, n. 5 (1989) ("Had the present § 1983 action been brought in federal court," the District Court would have "dismissed the plaintiff's damages claim as barred by the Eleventh Amendment"); *Maine* v. *Thiboutot*, 448 U. S. 1, 9, n. 7 (1980) ("[N]o Eleventh Amendment question is present, of course, where an action is brought in a state court"); cf. *Nevada* v. *Hall*, 440 U. S. 410, 420 (1979) (exercising appellate jurisdiction over action brought in state court against State but noting that the Eleventh Amendment "places explicit limits on the powers of federal courts to entertain suits against a State").

[10] See also *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990) ("[S]tate courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States"); The Federalist No. 82, p. 555 (J. Cooke ed. 1961) (A. Hamilton) ("[I]n every case in which [state courts] were not expressly excluded by the future acts of the national legislature, they will of course take cognizance of the causes to which

secure state-court compliance with, and national uniformity of, federal law, the exercise of jurisdiction by state courts over cases encompassing issues of federal law is subject to two conditions: State courts must interpret and enforce faithfully the "supreme Law of the Land," [11] and their decisions are subject to review by this Court. [12] Whereas the Eleventh

those acts may give birth. . . . [T]he inference seems to be conclusive that the state courts would have a concurrent jurisdiction in all cases arising under the laws of the union, where it was not expressly prohibited").

[11] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the contrary notwithstanding." U. S. Const., Art. VI.

[12] "Upon the State courts, equally with the courts of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the Constitution of the United States and the laws made in pursuance thereof, whenever those rights are involved in any suit or proceeding before them . . . . If they fail therein, and withhold or deny rights, privileges, or immunities secured by the Constitution and laws of the United States, the party aggrieved may bring the case from the highest court of the State in which the question could be decided to this court for final and conclusive determination." *Robb* v. *Connolly*, 111 U. S. 624, 637 (1884). See also *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill*, 281 U. S. 673, 681 (1930) ("[T]he plaintiff's claim is one arising under the Federal Constitution and, consequently, one on which the opinion of the state court is not final"); *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 347–348 (1816) (plenary appellate jurisdiction of Supreme Court motivated in part by "the importance, and even necessity of *uniformity* of decisions throughout the whole United States, upon all subjects within the purview of the constitution"). In *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985), the Court responded to the dissent's concern that state courts might inadequately protect federal rights despite the Supremacy Clause by adverting to the dissent's description, *id.*, at 256, n. 8, of a "longstanding, though unarticulated, rule that the Eleventh Amendment does not limit exercise of otherwise proper federal *appellate* jurisdiction over suits [against States] from state courts." *Id.*, at 240, n. 2.

Of course, though the Eleventh Amendment does not constrain this Court's appellate jurisdiction over such suits, appellate jurisdiction may be constrained for other reasons not apposite here. For example, a state-court judgment would be unreviewable were it to rest on an independent

Amendment has been construed so that a State retains immunity from original suit in federal court, see *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 237–240 (1985), it is "inherent in the constitutional plan," *Monaco* v. *Mississippi*, 292 U. S. 313, 329 (1934), that when a state court takes cognizance of a case, the State assents to appellate review by this Court of the federal issues raised in the case "whoever may be the parties to the original suit, whether private persons, or the state itself." [13] We recognize what has long been im-

and adequate state-law ground. See *Michigan* v. *Long*, 463 U. S. 1032, 1038, n. 4 (1983).

[13] *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 585 (1837) (Story, J., dissenting), citing *Cohens* v. *Virginia*, 6 Wheat. 264 (1821).

For example, in *Smith* v. *Reeves*, 178 U. S. 436 (1900), the Court dismissed a suit brought in federal court by an aggrieved taxpayer seeking a refund for a State's illegal assessment. We explained, however, that the State's decision to consent to suit only in state, but not federal, court is "subject always to the condition, arising out of the supremacy of the Constitution of the United States and the laws made in pursuance thereof, that the final judgment of the highest court of the State in any action brought against it with its consent may be reviewed or reexamined [by this Court], as prescribed by the act of Congress, if it denies to the plaintiff any right, title, privilege or immunity secured to him and specially claimed under the Constitution or laws of the United States." *Id.*, at 445.

Similarly, in *Chandler* v. *Dix*, 194 U. S. 590 (1904), the Court dismissed a quiet title suit brought in federal court by a citizen with respect to lands that had been taken by a State and sold to recoup compensation for certain tax deficiencies. The Court found that the State was a necessary party defendant and that the Eleventh Amendment barred initiation of the suit in federal court. The Court simultaneously declared, however, that "[o]f course, a taxpayer denied rights secured to him by the Constitution and laws of the United States, and specially set up by him, could bring the case here [to the Supreme Court] by writ of error from the highest courts of the State." *Id.*, at 592. See also *Rosewell* v. *LaSalle National Bank*, 450 U. S. 503, 515–516, n. 19 (1981) (under state tax refund scheme, "a taxpayer may raise all constitutional objections, including those based on the State's failure to pay interest or to return all unconstitutionally collected taxes, in the [state] legal refund proceeding, . . . after which the litigants have an opportunity to seek review in this Court").

plicit in our consistent practice and uniformly endorsed in our cases: The Eleventh Amendment does not constrain the appellate jurisdiction of the Supreme Court over cases arising from state courts. Accordingly, we turn to the merits of petitioner's claim.

III

It is undisputed that the Florida Supreme Court, after holding that the Liquor Tax unconstitutionally discriminated against interstate commerce because of its preferences for liquor made from "'crops which Florida is adapted to growing,'" 524 So. 2d, at 1008, acted correctly in awarding petitioner declaratory and injunctive relief against continued enforcement of the discriminatory provisions. The question before us is whether prospective relief, by itself, exhausts the requirements of federal law. The answer is no: If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment [14] obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation.[15]

---

[14] "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U. S. Const., Amdt. 14, § 1.

[15] Respondents do not question the Florida Supreme Court's holding that the Liquor Tax violated the Commerce Clause. And it is clear that, under the approaches advanced today in *American Trucking Assns., Inc.* v. *Smith, post,* p. 167, the Florida Supreme Court's holding governs the validity of respondents' taxation of petitioner prior to the date of the court's decision. Under JUSTICE O'CONNOR's approach, see *post,* at 177–178, the Florida court's decision applies retroactively because it rested on established principles of Commerce Clause jurisprudence. See *infra,* at 45–46. Under JUSTICE STEVENS' approach, *post,* at 212–218, the Florida court's decision, like all judicial decisions, applies retroactively. See also JUSTICE SCALIA's separate opinion, *post,* at 204–205; the circumstances present in that case warranting in his view a departure from *stare decisis* are not present here.

## A

We have not had occasion in recent years to explain the scope of a State's obligation to provide retrospective relief as part of its postdeprivation procedure in cases such as this.[16] Our approach today, however, is rooted firmly in precedent dating back to at least early this century. *Atchison, T. & S. F. R. Co.* v. *O'Connor,* 223 U. S. 280 (1912), involved a suit by a railroad company to recover taxes it had paid under protest, alleging that the tax scheme violated the Commerce Clause because most of the franchise tax was apportioned to business conducted wholly outside the State. The Court agreed that the franchise tax was unconstitutional and concluded that the railroad company was entitled to a refund of the portion of the tax imposed on out-of-state activity. Justice Holmes explained:

> "It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. The rule being established that apart from special circumstances he cannot interfere by injunction with the State's collection of its revenues, an action at law to recover back what he has paid is the alternative left. Of course we are speaking of those cases where the State is not put to an action if the citizen refuses to pay. In these latter he can interpose his objections by way of defence, but when, as is common, the State has a more summary remedy, such as distress, and the party indicates by protest that he is yielding to what he cannot prevent, courts sometimes perhaps have been a little too slow to recognize the implied duress under which payment is made.

---

[16] In the recent past, after invalidating a state tax scheme on Commerce Clause grounds, we have left state courts with the initial duty upon remand of crafting appropriate relief in accord with both federal and state law. See, *e. g., American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266, 297–298 (1987); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S., at 251–253; *Williams* v. *Vermont,* 472 U. S., at 28; *Bacchus Imports,* 468 U. S., at 277.

But even if the State is driven to an action, if at the same time the citizen is put at a serious disadvantage in the assertion of his legal, in this case of his constitutional, rights, by defence in the suit, justice may require that he should be at liberty to avoid those disadvantages by paying promptly and bringing suit on his side." *Id.*, at 285–286.

After finding that the railroad company's tax payment "was made under duress," *id.*, at 287, the Court issued a judgment entitling the company to a "refunding of the tax." *Ibid.* Thus was the taxpayer provided a "clear and certain remedy" for the State's unlawful extraction of tax moneys under duress.

In *Ward* v. *Love County Board of Comm'rs*, 253 U. S. 17 (1920), we reversed the Oklahoma Supreme Court's refusal to award a refund for an unlawful tax. A subdivision of the State sought to tax lands allotted by Congress to members of the Choctaw and Chickasaw Indian Tribes despite a provision of the allotment treaty making the " 'lands allotted . . . nontaxable while the title remains in the original allottee, but not to exceed twenty-one years from date of patent.'" *Id.*, at 19, quoting Act of June 28, 1898, § 29, 30 Stat. 507. To avoid a distress sale of its lands, the Choctaw Tribe paid the taxes under protest and then brought suit in state court to obtain a refund. We observed that "it is certain that the lands were nontaxable" by the State and its subdivisions under the allotment treaty and, therefore, the taxes were assessed in violation of federal law. 253 U. S., at 21. After finding that the Tribe paid the taxes under duress, *id.*, at 23, we ordered a refund. We explained the State's duty to remit the tax as follows:

"To say that the county could collect these unlawful taxes by coercive means and not incur any obligation to pay them back is nothing short of saying that it could take or appropriate the property of these Indian allottees arbitrarily and without due process of law. Of

> course this would be in contravention of the Fourteenth Amendment, which binds the county as an agency of the State." *Id.*, at 24.

See also *Carpenter* v. *Shaw*, 280 U. S. 363, 369 (1930) (holding, in a case analogous to *Ward*, that "a denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment").

In *Montana National Bank of Billings* v. *Yellowstone County*, 276 U. S. 499 (1928), we applied the same due process analysis to a tax that was unlawful because it was *discriminatory*, though otherwise within the State's power to impose. Montana officials had imposed a tax on shares of banks incorporated under federal law but not on shares of state-incorporated banks, relying on a Montana Supreme Court decision interpreting state law to preclude such taxation of state bank shares. The Montana National Bank of Billings paid its tax under protest and then brought suit for a refund. The bank contended that the different tax treatment violated § 5219 of the Revised Statutes, a federal statute requiring equal taxation of the shares of state and national banks. On appeal, the Montana Supreme Court overruled its previous interpretation of state law and held that thereafter shares of state banks could also be taxed, thus enabling state officials to comply with § 5219. *Montana National Bank of Billings* v. *Yellowstone County*, 78 Mont. 62, 252 P. 876 (1926). The court declined, however, to order a refund of the taxes that the Montana National Bank of Billings had paid during the period when state officials had exempted state banks in reliance on the court's earlier decision. *Id.*, at 86, 252 P., at 883. On writ of error, this Court acknowledged that the Montana Supreme Court's decision to overrule its previous interpretation of state law ensured for the future the equal treatment demanded by federal law. The Court noted, however, that prospective relief alone "d[id] not cure the mischief which had been done under the

earlier construction." 276 U. S., at 504. We held that the Montana National Bank of Billings "c[ould not] be deprived of its legal right to recover the amount of the tax unlawfully exacted of it by the later [Montana Supreme Court] decision which, while repudiating the construction under which the unlawful exaction was made, le[ft] the monies thus exacted in the public treasury," *id.*, at 504–505, and therefore the bank enjoyed "an undoubted right to recover" the moneys it had paid. *Id.*, at 504.

The Court in *Montana National Bank* recognized that the federal mandate of equal treatment could have been satisfied by collecting back taxes from state banks rather than by granting a refund to national banks. *Id.*, at 505. But as to this possibility, the Court remarked:

> "[I]t is unnecessary to say more than that it nowhere appears that these [taxing] officers, if they possess the power [to assess back taxes], have undertaken to exercise it or that they have any intention of ever doing so. It will be soon enough to invite consideration of this purely speculative suggestion when, if ever, the taxing officials shall have put it into practical effect." *Ibid.*

*Montana National Bank* thus held that one forced to pay a discriminatorily high tax in violation of federal law is entitled, in addition to prospective relief, to a refund of the excess tax paid—at least unless the disparity is removed in some other manner.

We again applied this analysis to a discriminatory tax in *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239 (1931). The Court held unanimously that the State of Iowa's taxation of the shares of state and national banks at a higher rate than those of competing domestic corporations violated the Equal Protection Clause. *Id.*, at 245–246. With respect to the banks' claim for a refund of excess taxes paid, Justice Brandeis explained:

"The [banks'] rights were violated, and the causes of action arose, when taxes at the lower rate were collected from their competitors. It may be assumed that all ground for a claim for refund would have fallen if the State, promptly upon discovery of the discrimination, had removed it by collecting the additional taxes from the favored competitors. By such collection the [banks'] grievances would have been redressed, for these are not primarily overassessment. The right invoked is that to equal treatment; and such treatment will be attained if either their competitors' taxes are increased or their own reduced." *Id.*, at 247.

But the State did not elect to set matters right by collecting additional taxes from the banks' competitors for the four tax years encompassed by the suit. And the Court found it "well settled" that the banks could not be "remitted to the necessity of awaiting such action by the state officials upon their own initiative." *Ibid.* The Court held, therefore, that the banks were "entitled to obtain in these suits refund of the excess of taxes exacted from them." *Ibid.*

## B

These cases demonstrate the traditional legal analysis appropriate for determining Florida's constitutional duty to provide relief to petitioner McKesson for its payment of an unlawful tax. Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause.[17] The State may choose to provide a form of "predeprivation process," for example, by authorizing taxpayers to bring suit to enjoin imposition of a

---

[17] See, *e. g., Mathews* v. *Eldridge,* 424 U. S. 319, 333 (1976) ("This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest"); *Central of Georgia R. Co.* v. *Wright,* 207 U. S. 127, 138–142 (1907); *Davidson* v. *New Orleans,* 96 U. S. 97, 104–105 (1878).

tax prior to its payment, or by allowing taxpayers to with-hold payment and then interpose their objections as defenses in a tax enforcement proceeding initiated by the State. However, whereas "[w]e have described 'the root require-ment' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest,'" *Cleveland Bd. of Educa-tion* v. *Loudermill*, 470 U. S. 532, 542 (1985) (citation omit-ted), it is well established that a State need not provide pre-deprivation process for the exaction of taxes.[18] Allowing taxpayers to litigate their tax liabilities prior to payment might threaten a government's financial security, both by creating unpredictable interim revenue shortfalls against which the State cannot easily prepare, and by making the ul-timate collection of validly imposed taxes more difficult.[19] To protect government's exceedingly strong interest in finan-cial stability in this context, we have long held that a State may employ various financial sanctions and summary reme-dies, such as distress sales, in order to encourage taxpayers to make timely payments prior to resolution of any dispute over the validity of the tax assessment.

---

[18] See, *e. g.*, *Bob Jones University* v. *Simon*, 416 U. S. 725, 746 (1974); *Phillips* v. *Commissioner*, 283 U. S. 589, 595–597 (1931); *Dodge* v. *Osborn*, 240 U. S. 118, 122 (1916).

[19] See, *e. g.*, *California* v. *Grace Brethren Church*, 457 U. S. 393, 410 (1982) ("'During [prepayment litigation] the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer in-solvency'"), quoting *Perez* v. *Ledesma*, 401 U. S. 82, 128, n. 17 (1971) (BRENNAN, J., concurring in part and dissenting in part); *Dows* v. *City of Chicago*, 11 Wall. 108, 110 (1871) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective govern-ments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of gov-ernment, and thereby cause serious detriment to the public").

Florida has availed itself of this approach, establishing various sanctions and summary remedies designed so that liquor distributors tender tax payments *before* their objections are entertained and resolved.[20] As a result, Florida does not purport to provide taxpayers like petitioner with a meaningful opportunity to withhold payment and to obtain a predeprivation determination of the tax assessment's validity;[21] rather, Florida requires taxpayers to raise their objections to

---

[20] If a distributor fails to pay the tax on time, the Division of Alcoholic Beverages and Tobacco may issue a warrant which, when filed in a local circuit court, directs the county sheriff to levy upon and sell the delinquent taxpayer's goods and chattels to recover the amount of the unpaid tax plus a penalty of 50%, along with interest of 1% per month and the costs of executing the warrant. Fla. Stat. § 210.14(1) (1989). In addition, the Division may revoke, § 561.29(1)(a), or decline to renew, § 561.24(5), a distributor's license for failure to abide by Florida law, including the statutory requirement that the Liquor Tax be timely paid.

[21] We have long held that, when a tax is paid in order to avoid financial sanctions or a seizure of real or personal property, the tax is paid under "duress" in the sense that the State has not provided a fair and meaningful predeprivation procedure. See, *e. g., United States* v. *Mississippi Tax Comm'n*, 412 U. S. 363, 368 (1973) (economic sanctions for nonpayment); *Ward* v. *Love County Board of Comm'rs*, 253 U. S. 17, 23 (1920) (distress sale of land); *Gaar, Scott & Co.* v. *Shannon*, 223 U. S. 468, 471 (1912) (both). Justice Holmes suggested in *Atchison, T. & S. F. R. Co.* v. *O'Connor*, 223 U. S. 280 (1912), that a taxpayer pays "under duress" when he proffers a timely payment merely to avoid a "serious disadvantage in the assertion of his legal . . . rights" should he withhold payment and await a state enforcement proceeding in which he could challenge the tax scheme's validity "by defence in the suit." *Id.*, at 286.

In contrast, if a State chooses not to secure payments under duress and instead offers a meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing, payments tendered may be deemed "voluntary." The availability of a predeprivation hearing constitutes a procedural safeguard against unlawful deprivations sufficient by itself to satisfy the Due Process Clause, and taxpayers cannot complain if they fail to avail themselves of this procedure. See *Mississippi Tax Comm'n, supra*, at 368, n. 11 ("[W]here voluntary payment [of a tax] is knowingly made pursuant to an illegal demand, recovery of that payment may be denied").

the tax in a postdeprivation refund action. To satisfy the requirements of the Due Process Clause, therefore, in this refund action the State must provide taxpayers with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation,[22] but also a "clear and certain remedy," *O'Connor,* 223 U. S., at 285, for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.

Had the Florida courts declared the Liquor Tax invalid either because (other than its discriminatory nature) it was beyond the State's power to impose, as was the unapportioned tax in *O'Connor,* or because the taxpayers were absolutely immune from the tax, as were the Indian Tribes in *Ward* and *Carpenter,* no corrective action by the State could cure the invalidity of the tax during the contested tax period. The State would have had no choice but to "undo" the unlawful deprivation by refunding the tax previously paid under duress, because allowing the State to "collect these unlawful taxes by coercive means and not incur any obligation to pay them back . . . would be in contravention of the Fourteenth Amendment." *Ward,* 253 U. S., at 24; see also *Carpenter,* 280 U. S., at 369.

Here, however, the Florida courts did not invalidate the Liquor Tax in its entirety; rather, they declared the tax scheme unconstitutional only insofar as it operated in a manner that discriminated against interstate commerce. The State may, of course, choose to erase the property deprivation itself by providing petitioner with a full refund of its tax payments. But as both *Montana National Bank* and *Bennett* illustrate, a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this

---

[22] See n. 17, *supra;* see also, *e. g., Mathews,* 424 U. S., at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'") (citation omitted). The adequacy of this aspect of Florida's postdeprivation procedure is not in dispute.

determination. Florida may reformulate and enforce the Liquor Tax during the contested tax period in any way that treats petitioner and its competitors in a manner consistent with the dictates of the Commerce Clause. Having done so, the State may retain the tax appropriately levied upon petitioner pursuant to this reformulated scheme because this retention would deprive petitioner of its property pursuant to a tax scheme that is *valid* under the Commerce Clause. In the end, the State's postdeprivation procedure would provide petitioner with all of the process it is due: an opportunity to contest the validity of the tax and a "clear and certain remedy" designed to render the opportunity meaningful by preventing any permanent unlawful deprivation of property.

More specifically, the State may cure the invalidity of the Liquor Tax by refunding to petitioner the difference between the tax it paid and the tax it would have been assessed were it extended the same rate reductions that its competitors actually received. Cf. *Montana National Bank* and *Bennett* (curing discrimination through such refunds). Alternatively, to the extent consistent with other constitutional restrictions, the State may assess and collect back taxes from petitioner's competitors who benefited from the rate reductions during the contested tax period, calibrating the retroactive assessment to create in hindsight a nondiscriminatory scheme. Cf. *Bennett,* 284 U. S., at 247 (suggesting State could erase the unconstitutional discrimination by "collecting the additional taxes from the favored competitors").[23] Fi-

---

[23] We previously have held that the retroactive assessment of a tax increase does not necessarily deny due process to those whose taxes are increased, though beyond some temporal point the retroactive imposition of a significant tax burden may be "so harsh and oppressive as to transgress the constitutional limitation," depending on "the nature of the tax and the circumstances in which it is laid." *Welch* v. *Henry,* 305 U. S. 134, 147 (1938). See *United States* v. *Hemme,* 476 U. S. 558 (1986); *United States* v. *Darusmont,* 449 U. S. 292 (1981); cf. *United States* v. *Sperry Corp.,* 493 U. S. 52, 65 (1989) ("It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of

nally, a combination of a partial refund to petitioner and a partial retroactive assessment of tax increases on favored competitors, so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce, would render petitioner's resultant deprivation lawful and therefore satisfy the Due Process Clause's requirement of a fully adequate postdeprivation procedure.

Respondents suggest that, in order to redress fully petitioner's unconstitutional deprivation, the State need not *actually* impose a constitutional tax scheme retroactively on all distributors during the contested tax period. Rather, they claim, the State need only place petitioner in the same tax position that petitioner *would have been placed* by such a hypothetical scheme. Specifically, respondents contend that the State, had it known that the Liquor Tax would be declared unconstitutional, would have imposed the higher flat tax rate on all distributors. Because petitioner would have paid the same tax under this hypothetical scheme as it did under the Liquor Tax, respondents claim that petitioner is not entitled to any retrospective relief (at least in the form of a refund);

persons that Congress rationally believes should bear them"); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16 (1976) ("[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts") (citations omitted).

Because we do not know whether the State will choose in this case to assess and collect back taxes from previously favored distributors, we need not decide whether this choice would violate due process by unduly interfering with settled expectations.

Should the State choose this remedial alternative, the State's effort to collect back taxes from previously favored distributors may not be perfectly successful. Some of these distributors, for example, may no longer be in business. But a good-faith effort to administer and enforce such a retroactive assessment likely would constitute adequate relief, to the same extent that a tax scheme would not violate the Commerce Clause merely because tax collectors inadvertently missed a few in-state taxpayers.

such relief would confer a "windfall" on petitioner by leaving it with a smaller tax burden than it would have borne were there no Commerce Clause violation in the first place.

We implicitly rejected this line of reasoning in *Montana National Bank* and *Bennett*, and we expressly do so today. Even aside from the contrived and self-serving nature of the baseline against which respondents propose to measure petitioner's "deprivation,"[24] respondents' approach is inconsistent with the nature of the State's due process obligation. The deprivation worked by the Liquor Tax violated the Commerce Clause because the tax scheme's purpose and effect was to impose a relative disadvantage on a category of distributors (those dealing with nonpreferred products) largely composed of out-of-state companies, not because its treatment of this category of distributors diverged from some fixed substantive norm.[25] Hence, the salient feature of the position petitioner "should have occupied" absent any Commerce Clause violation is its equivalence to the position actually occupied by petitioner's favored competitors.

---

[24] Whether the State would have taxed all distributors at the highest rate authorized by the Liquor Tax depends upon counterfactual assumptions regarding the many complex variables that affect legislative judgment, and therefore respondents' prediction is not easily proved. It is quite possible, for example, that had the legislature been unable to enact the discriminatory Liquor Tax, the legislature instead would have extended universally the lower tax rate because it would have preferred to keep to a minimum the absolute economic burden on Florida growers of the preferred products as well as on the (mostly in-state) distributors of those products — even though this particular aspect of the tax scheme would generate less total revenue.

[25] The Florida Supreme Court noted that "[i]t is undisputed that manufacturers and distributors of beverages which qualify for preferential treatment under [the Liquor Tax] are in direct competition with manufacturers and distributors of alcoholic beverages which do not. . . . With these facts in mind it becomes quite apparent that . . . Florida's alcoholic beverage tax scheme clearly raises the relative cost of doing business for a manufacturer or distributor of alcoholic beverages which are not made from base crops which are 'adapted to growing in Florida.'" 524 So. 2d 1000, 1008 (1988).

But the State's offer to restore petitioner only to the same *absolute* tax position it would have enjoyed if taxed according to a "hypothetical" nondiscriminatory scheme does not in hindsight avoid the unlawful deprivation: It still in fact treats petitioner worse than distributors using the favored local products, thereby perpetuating the Commerce Clause violation during the contested tax period. Respondents are therefore correct that petitioner's "claim for a refund thus asks for much more than prompt injunctive relief would have achieved"[26] only in the narrow sense that petitioner's absolute tax burden might be lower after the refund than if the tax preferences had immediately been enjoined such that all distributors were taxed at the higher rates. However, only an *actual* refund (or other retroactive adjustment of the tax burdens borne by petitioner and/or its favored competitors during the contested tax period) can bring about the *nondiscrimination* that "prompt injunctive relief would have achieved." If, through the State's own choice of relief, petitioner ends up paying a smaller tax than it would have paid if the State initially had imposed the highest rate on everyone, petitioner would not enjoy an unpalatable "windfall." Rather, petitioner would merely be protected from the comparative economic disadvantage proscribed by the Commerce Clause. Hence, the State's duty under the Due Process Clause to provide a "clear and certain remedy" requires it to ensure that the tax as *actually imposed* on petitioner and its competitors during the contested tax period does not deprive petitioner of tax moneys in a manner that discriminates against interstate commerce.[27]

---

[26] Brief for Respondents on Rearg. 15.

[27] Respondents also assert that no refund is appropriate because petitioner most likely would pay the same amount of tax even if the *preferred* sliding scale tax schedules were retroactively extended to petitioner. As explained earlier, see n. 2, *supra*, the tax rate on preferred products under the Liquor Tax varies with the total volume of such products sold. Respondents suggest that, were the sliding scale schedule applied to petitioner, then "the gallons of alcoholic beverages sold by petitioner (and the

## C

The Florida Supreme Court cites two "equitable consider-ations" as grounds for providing petitioner only prospective relief, but neither is sufficient to override the constitutional requirement that Florida provide retrospective relief as part of its postdeprivation procedure. The Florida court first mentions that "the tax preference scheme [was] implemented by the [Division of Alcoholic Beverages and Tobacco] in good faith reliance on a presumptively valid statute." 524 So. 2d, at 1010. This observation bespeaks a concern that a State's obligation to provide refunds for what later turns out to be an unconstitutional tax would undermine the State's ability to engage in sound fiscal planning. However, leaving aside the

---

other distributors who previously paid the generally-applicable tax) [would have to be] included in the calculation" of the appropriate tax rate. Brief for Respondents 28. Cf. *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 719–720, n. 36 (1978) (suggesting that it would be within district court's equitable discretion, when devising remedy for Title VII violation arising from sex-based determination of insurance premiums, to determine appropriate relief based on recalculation of the premium required for an actuarially sound and nondiscriminatory insurance plan). Were the total volume of all sales included in the rate calculation, "it is virtually certain that the maximum rates under the scales would routinely apply. . . . It appears highly likely, therefore, that petitioner would owe the same amount of tax." Brief for Respondents 28.

We agree with respondents that the State might remedy the invalidity of petitioner's deprivation by extending to petitioner the sliding scale schedule in a nondiscriminatory fashion—but respondents' proposal would appear not to accomplish this result. If, as proposed, the State were to calculate the tax rate applicable to petitioner based on the total volume of sales of both preferred and nonpreferred goods, but leave untouched the taxes actually collected from the favored distributors based on the volume of sales of only preferred goods, the resulting tax scheme would itself raise questions under the Commerce Clause due to the State's use of a different "volume" variable for the preferred and nonpreferred goods in a manner that clearly disadvantages the latter. In order to cure the illegality of the tax as originally imposed, the State must ultimately collect a tax for the contested tax period that in no respect impermissibly discriminates against interstate commerce.

fact that the State might avoid any such disruption by choosing (consistent with constitutional limitations) to collect back taxes from favored distributors rather than to offer refunds, we do not find this concern weighty in these circumstances. A State's freedom to impose various procedural requirements on actions for postdeprivation relief sufficiently meets this concern with respect to future cases. The State might, for example, provide by statute that refunds will be available only to those taxpayers paying under protest or providing some other timely notice of complaint; execute any refunds on a reasonable installment basis; enforce relatively short statutes of limitations applicable to such actions;[28] refrain from collecting taxes pursuant to a scheme that has been declared invalid by a court or other competent tribunal pending further review of such declaration on appeal; and/or place challenged tax payments into an escrow account or employ other accounting devices such that the State can predict with greater accuracy the availability of undisputed treasury funds. The State's ability in the future to invoke such procedural protections suffices to secure the State's interest in stable fiscal planning when weighed against its constitutional obligation to provide relief for an unlawful tax.

And in the present case, Florida's failure to avail itself of certain of these methods of self-protection weakens any "equitable" justification for avoiding its constitutional obligation to provide relief.[29] Moreover, even were we to assume that

---

[28] See *Ward* v. *Love County Board of Comm'rs*, 253 U. S., at 25 (recognizing refund claim could be barred if there was "any valid local [limitations] law in force when the claim was filed"); see also Fla. Stat. § 215.26(2) (1989) (generally applicable 3-year limitations period for tax refund actions).

[29] For example, even after the Florida trial court held that the Liquor Tax violated the Commerce Clause and enjoined the tax preferences for local products, the State did not join petitioner's motion to vacate the stay automatically imposed pending appeal, thus continuing the unconstitutional tax assessment for an extra 11 months. See n. 5, *supra*. The State also opposed the suggestion that it place into a separate escrow account the

the State's reliance on a "presumptively valid statute" was a relevant consideration to Florida's obligation to provide relief for its unconstitutional deprivation of property, we would disagree with the Florida court's characterization of the Liquor Tax as such a statute. The Liquor Tax reflected only cosmetic changes from the prior version of the tax scheme that itself was virtually identical to the Hawaii scheme invalidated in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984). See App. 263 (trial court held that the revised "legislation failed to surmount the constitutional violations addressed in *Bacchus [Imports]*"). The State can hardly claim surprise at the Florida courts' invalidation of the scheme.

The Florida Supreme Court also speculated that "if given a refund, [petitioner] would in all probability receive a windfall, since the cost of the tax has likely been passed on to [its] customers." 524 So. 2d, at 1010. The court's premise seems to be that the State, faced with an obligation to cure its discrimination during the contested tax period and choosing to meet that obligation through a refund, could legitimately choose to avoid generating a "windfall" for petitioner by refunding only that portion of the tax payment not "passed on" to customers (or even suppliers). Even were we to accept this premise, the State could not refuse to provide a refund based on sheer speculation that a "pass-on" occurred.[30]

---

discriminatory portion of taxes collected during this period of time, on the ground that "[t]here is a statutory mechanism in place . . . allowing for refunds." App. 286.

[30] The state trial court, after ruling favorably upon petitioner's motions for a preliminary injunction and partial summary judgment based on its holding that the Liquor Tax violated the Commerce Clause, ruled *sua sponte* that its judgment would have only prospective effect, and this ruling was upheld on direct appeal. At no time has any party had the opportunity to present evidence concerning the extent, if any, of petitioner's ability to pass on the economic burden of the excise tax to its consumers or suppliers. The Florida Supreme Court's statement that the tax "has likely been passed on" by petitioner therefore is purely speculative.

We repeatedly have recognized that determining whether a particular business cost has in fact been passed on to customers or suppliers entails a highly sophisticated theoretical and factual inquiry; a court certainly cannot withhold part of a refund otherwise required to rectify an unconstitutional deprivation without first satisfactorily engaging in this inquiry.[31]

In any event, however, we reject respondents' premise that "equitable considerations" justify a State's attempt to avoid bestowing this so-called "windfall" when redressing a tax that is unconstitutional because discriminatory. In *United States* v. *Jefferson Electric Mfg. Co.*, 291 U. S. 386 (1934), we enforced a statutorily created pass-on defense in a refund action designed to redress a tax overassessment. Comparing such an action to one in assumpsit for "money had and received," we affirmed the Federal Government's power in this equitable action to withhold the amount that the taxpayer had already passed on to others, on the theory that the taxpayer ought not be "unjustly enriched" by his recovery from the Government after he has already "recovered" his losses through the pass-on. We observed that if the taxpayer "has shifted the [economic] burden [of the tax] to the purchasers, they and not he have been the actual sufferers

---

[31] We have expressed particular concern about the theoretical, factual, and practical difficulties in engaging in satisfactory "pass-on" analysis in the context of antitrust doctrine. See *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 741–745 (1977); *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 492–493 (1968). See generally A. Atkinson & J. Stiglitz, Lectures on Public Economics 160–226 (1980); R. Musgrave & P. Musgrave, Public Finance In Theory and Practice 256–300 (3d ed. 1980); McLure, Incidence Analysis and the Supreme Court: Examination of Four Cases from the 1980 Term, 1 Sup. Ct. Econ. Rev. 69 (1982); D. Phares, Who Pays State and Local Taxes? (1980). For this reason, we have observed that determining whether a particular business cost has been passed on "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe, supra*, at 493.

and are the real parties in interest," *id.*, at 402, and he ought not receive a windfall for their injury.

But petitioner does not challenge here a tax assessment that merely exceeded the amount authorized by statute; petitioner's complaint was that the Florida tax scheme unconstitutionally discriminated against interstate commerce. The tax injured petitioner not only because it left petitioner poorer in an absolute sense than before (a problem that might be rectified to the extent petitioner passed on the economic incidence of the tax to others), but also because it placed petitioner at a relative disadvantage in the marketplace vis-à-vis competitors distributing preferred local products. See n. 25, *supra;* see also *Bacchus Imports, supra,* at 267 ("[E]ven if the tax [was] completely and successfully passed on, it increase[d] the price of [petitioner's] products as compared to the exempted beverages"). To whatever extent petitioner succeeded in passing on the economic incidence of the tax through higher prices to its customers, it most likely lost sales to the favored distributors or else incurred other costs (*e. g.,* for advertising) in an effort to maintain its market share.[32] The State cannot persuasively claim that "equity" entitles it to retain tax moneys taken unlawfully from petitioner due to its pass-on of the tax where the pass-on itself furthers the very competitive disadvantage constituting the Commerce Clause violation that rendered the deprivation un-

---

[32] Petitioner's relative market share might have stayed constant if the favored distributors reacted by raising their own prices to the same extent as did petitioner when trying to pass on its excess tax burden. If so, however, petitioner still would have suffered a comparative economic injury because the tax pass-on would have enabled the favored distributors alone to derive an increase in total revenue from the discriminatory tax.

Petitioner's market share and total revenue also might have stayed constant, at least in the short run, had all of its sales to liquor retailers been pursuant to cost-plus contracts. See *Hanover Shoe, supra,* at 494. But respondents do not claim that petitioner was in this position.

lawful in the first place.[33] We thus reject respondents' reliance on a pass-on defense in this context.[34]

## D

Respondents assert that requiring the State to rectify its unconstitutional discrimination during the contested tax period "would plainly cause serious economic and adminis-

---

[33] It is conceivable that a particular distributor's economic injury may be quite severe, for example, if the tax drives it out of the market entirely (though a rational disfavored distributor would not allow itself to incur any greater economic injury through a pass-on than it would have incurred had it simply shouldered the entire burden of the tax deprivation itself). However, the State's obligation under the Due Process Clause to provide a refund (should it choose this avenue of relief) extends only to refunding the excess taxes collected under the Liquor Tax. Petitioner has not sought in this action to recover any actual damages it may have suffered. See Brief for Petitioner on Rearg. 3, n. 2; *id.*, at 7.

[34] Respondents suggest that a pass-on defense may nevertheless be invoked as a matter of state law. While they concede that the State waived any sovereign immunity from suit through Fla. Stat. § 215.26's authorization of a state-court refund action, they contend that this waiver extends only to refunds sought where the taxpayer has borne the actual economic burden of the tax, citing *State ex rel. Szabo Food Service, Inc.* v. *Dickinson*, 286 So. 2d 529 (Fla. 1973). We need not consider the import of this contention, however, because respondents misdescribe state law. In this case, the Florida Supreme Court characterized its concern about petitioner receiving a "windfall" due to the alleged pass-on of its tax burden as only an "equitable consideration," not a state-law prohibition on relief. Moreover, no such state-law prohibition was recognized in *Szabo Food Service, supra.* There, the Florida Supreme Court refused to entertain a refund action brought by a distributor of food products to challenge a sales tax alleged to have been imposed erroneously as a matter of state law. The court noted that the legal incidence of the sales tax was placed not on the distributor but rather on its customers and that state law required the economic burden of the tax to be borne by the customers as well. *Id.*, at 532. The court held that under these unique circumstances the distributor lacked standing to seek a refund, explaining that "[o]ne who does not himself bear the financial burden of a wrongfully extracted tax suffers no loss or injury, and accordingly, would not have standing to demand a refund." *Ibid.* The court in *Szabo* did not mention, let alone rely on, a state-law immunity bar to the refund action.

trative dislocation for the State." Brief for Respondents on Rearg. 20. We agree that, within our due process jurisprudence, state interests traditionally have played, and may play, some role in shaping the contours of the relief that the State must provide to illegally or erroneously deprived taxpayers, just as such interests play a role in shaping the procedural safeguards that the State must provide in order to ensure the accuracy of the initial determination of illegality or error. See generally *Mathews* v. *Eldridge*, 424 U. S. 319, 347–348 (1976). We have already noted that States have a legitimate interest in sound fiscal planning and that this interest is sufficiently weighty to allow States to withhold predeprivation relief for allegedly unlawful tax assessments, providing postdeprivation relief only. See *supra*, at 37. But even if a State chooses to provide partial refunds as a means of curing the unlawful discrimination (as opposed to increasing the tax assessment of those previously favored), the State's interest in financial stability does not justify a refusal to provide relief. As noted earlier, see *supra*, at 46, the State here does not and cannot claim that the Florida courts' invalidation of the Liquor Tax was a surprise, and even after the trial court found a Commerce Clause violation the State failed to take reasonable precautions to reduce its ultimate exposure for the unconstitutional tax. And in the future, States may avail themselves of a variety of procedural protections against any disruptive effects of a tax scheme's invalidation, such as providing by statute that refunds will be available to only those taxpayers paying under protest, or enforcing relatively short statutes of limitation applicable to refund actions. See *supra*, at 45. Such procedural measures would sufficiently protect States' fiscal security when weighed against their obligation to provide meaningful relief for their unconstitutional taxation.

Respondents also observe that the State's choice of relief may entail various administrative costs (apart from the "cost"

of any refund itself[35]). Cf. *Mathews, supra,* at 348 ("[T]he
Government's interest . . . in conserving scarce fiscal and ad-
ministrative resources is a factor that must be weighed"
when determining precise contours of process due). The
State may, of course, consider such costs when choosing be-
tween the various avenues of relief open to it. Because the
Florida Supreme Court did not recognize in its refund pro-
ceeding the State's obligation under the Due Process Clause
to rectify the invalidity of its deprivation of petitioner's prop-
erty, the court did not consider how any administrative costs
might influence the selection and fine-tuning of the relief
afforded petitioner. We leave this to the state court on
remand.

## IV

When a State penalizes taxpayers for failure to remit their
taxes in timely fashion, thus requiring them to pay first be-
fore obtaining review of the tax's validity, federal due proc-
ess principles long recognized by our cases require the
State's postdeprivation procedure to provide a "clear and cer-
tain remedy," *O'Connor,* 223 U. S., at 285, for the depriva-
tion of tax moneys in an unconstitutional manner. In this
case, Florida may satisfy this obligation through any form of
relief, ranging from a refund of the excess taxes paid by peti-
tioner to an offsetting charge to previously favored distribu-
tors, that will cure any unconstitutional discrimination
against interstate commerce during the contested tax period.
The State is free to choose which form of relief it will provide,
so long as that relief satisfies the minimum federal require-

---

[35] We reject respondents' intimation that the cost of any refund consid-
ered by the State might justify a decision to withhold it. Just as a State
may not object to an otherwise available remedy providing for the return of
real property unlawfully taken or criminal fines unlawfully imposed simply
because it finds the property or moneys useful, so also Florida cannot ob-
ject to a refund here just because it has other ideas about how to spend the
funds.

ments we have outlined.[36] The judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

[36] The State is free, of course, to provide broader relief as a matter of state law than is required by the Federal Constitution. See *Bacchus Imports*, 468 U. S., at 277, n. 14.