[No. C046153. Third Dist. Apr. 25, 2005.]

COUNTRY EGGS, INC., Plaintiff and Appellant, v.
A.G. KAWAMURA, as Secretary, et al., Defendants and Respondents.

## COUNSEL

Brian C. Leighton for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Linda L. Berg, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**HULL, J.**—At issue in this case is whether plaintiff Country Eggs, Inc., can collect a judgment owed by the California Egg Commission (the Commission) from defendants State of California and the California Department of Food and Agriculture (referred to collectively as "defendants" or "the State"). We hold that, since the State did not receive the funds that were the basis for plaintiff's judgment against the Commission and, as to the State, plaintiff's claim is for money damages and not for specific monetary relief, that claim is barred by the doctrine of sovereign immunity.

Food and Agricultural Code section 75070, subdivision (a) provides: "The state shall not be liable for the acts of the [C]ommission or its contracts. Payments of all claims arising by reason of the . . . acts of the [C]ommission are limited to the funds collected by the [C]ommission." (Unspecified statutory references that follow are to the Food and Agricultural Code.)

The trial court upheld the constitutionality of this statute, ruled that defendants had no liability for the judgment against the Commission, and granted defendants' motion for summary judgment. Plaintiff appeals from the ensuing judgment. We affirm the judgment.

### FACTS AND PROCEEDINGS

The following is an abbreviated version of the long and convoluted history of this case.

Plaintiff is an egg handler who paid mandated assessments to the Commission for the Commission's educational and promotional work. In February 1997, plaintiff filed a complaint in federal district court against the Commission, asserting this assessment scheme violated its constitutional rights of free speech and free association.

In July 1997, the parties stipulated to the terms of a preliminary injunction that required the Commission to deposit the bulk of plaintiff's assessments into an escrow account. Three months later, in October 1997, the district court granted the Commission's motion for judgment on two of plaintiff's causes of action, but gave plaintiff leave to amend its complaint. The court also vacated the preliminary injunction.

A few weeks later, in November 1997, plaintiff filed its amended complaint reiterating its claims that the assessments violated its constitutional rights.

This complaint also included a request for a preliminary injunction to preclude assessments or escrow their payment, but the record does not indicate that plaintiff pursued this request.

The Commission responded by filing a counterclaim, contending plaintiff was delinquent in paying its assessments. In November 1998, the district court granted the Commission's request for a preliminary injunction and ordered plaintiff to pay the assessments.

Given the then-current state of the law on the constitutionality of these types of assessments, plaintiff did not believe it would prevail at trial, and it decided not to incur additional legal fees to pursue the matter. The parties entered into a stipulated order for judgment and dismissal whereby plaintiff agreed to continue paying its assessments under the negotiated terms of the injunction. The court entered this judgment on June 9, 1999, and the litigation in federal court effectively came to an end.

Less than one year later, in March 2000, plaintiff filed a complaint for injunctive and declaratory relief in state court, naming the Commission and the Secretary of the Department of Food and Agriculture (the Department) as defendants. Plaintiff contended the assessment scheme violated its state constitutional rights to free speech and free association. It also asserted the assessments exceeded the State's police powers and thereby violated due process guarantees as well. Plaintiff's complaint again included a request for a preliminary injunction to escrow its assessments. However, the record does not reflect or suggest that plaintiff pursued this request while the matter was pending in the trial court, even after the Department suggested that the court might take such a measure.

The court granted plaintiff's motion for summary judgment. In its judgment entered on May 1, 2001, the court concluded the assessment system violated plaintiff's constitutional rights, and it enjoined the Commission from collecting these assessments. It also ruled that plaintiff was "entitled to a refund of any and all assessments, penalties, and interest that Plaintiff paid to the [Commission] from and including June 1, 1999 through the time this judgment is entered . . . ." The judgment further provided that if the parties could not agree on the amount of refund owing, the matter could be set for hearing upon the motion of either party.

Both the Commission and the Department filed notices of appeal.

On October 11, 2001, while the matter was pending on appeal, plaintiff filed a motion in the trial court to require the Commission to pay the

judgment or escrow the amount owing. On December 10, 2001, the trial court denied this motion and amended its earlier judgment to specify that the amount of assessments, penalties, and interest to be refunded was $166,408.95. The court also made what it termed a "clerical correction" to specify that this refund was awarded only against the Commission, and not the Department or the State.

On January 11, 2002, plaintiff filed a motion in this court seeking to require the Commission to post a bond or escrow the judgment pending appeal. We denied that request on February 1, 2002. On February 13, the Commission dismissed its appeal. The Department did the same one week later.

Other relevant events were occurring around the same time. On December 31, 2001, the Commission voted to recommend to the Department that the Commission's activities be suspended, and it submitted a request to the Department for a referendum of eligible egg handlers on this question. (See § 75173.) The handlers voted overwhelmingly in favor of suspending the Commission's operations. On February 14, 2002, the Department certified the results and issued an order declaring the Commission suspended. Although the effective date of this suspension was not until January 1, 2003, the Commission apparently began winding down its affairs immediately.

On March 25, 2002, plaintiff obtained a writ of execution for $169,379.30 against the Commission. It levied against the Commission's bank account on April 4, 2002, but because the Commission was no longer collecting assessments, only slightly more than $22,000 was available to satisfy the judgment.

Plaintiff filed a claim with the State Board of Control for the remaining $147,218.69 owed on its judgment. When that claim was rejected, the litigation at the heart of this appeal began.

In a complaint for declaratory and injunctive relief, plaintiff asserted that the State was liable for the debts of the Commission in part because it had allowed the Commission to go out of business without requiring it to set aside sufficient funds to pay the judgment. It sought a declaration that section 75070, the immunity provision set forth earlier in this opinion, violated due process protections of both the federal and state Constitutions, and it sought a "refund of assessments, restitution and/or damages in the amount of $147,218.69 plus interest . . . ."

The trial court granted defendants' motion for summary judgment, ruling that section 75070 did not violate due process and that defendants were not

vicariously liable for the Commission's debt. Plaintiff appeals from the ensuing judgment.

## DISCUSSION

At its essence, plaintiff's action is an attempt to collect an apparently uncollectible judgment. Plaintiff frames this effort as a matter of due process, asserting that its constitutional rights are violated if defendants are not held accountable for the outstanding judgment because it was defendants who permitted the Commission to go out of business without ensuring that the Commission had safeguarded the funds owed to plaintiff. Like the trial court, we conclude that there is no constitutional infirmity in the present case.

Plaintiff relies heavily on *McKesson Corp. v. Florida Alcohol & Tobacco Div.* (1990) 496 U.S. 18 [110 L.Ed.2d 17, 110 S.Ct. 2238] (*McKesson*), a case that is readily distinguishable from the situation before us. *McKesson* involved a Florida liquor excise tax scheme that required a taxpayer to pay any assessed tax before challenging the assessment. (*Id.* at p. 38 [110 L.Ed.2d at p. 36].) In *McKesson*, the plaintiff complied with this procedure: it paid its taxes and then challenged the constitutionality of the excise tax. The state courts invalidated the tax scheme but refused to order a refund or any other relief for the taxes plaintiff had paid. (*Id.* at p. 22 [110 L.Ed.2d at p. 26].)

The United States Supreme Court reversed the court's decision to deny relief, holding that "if a State penalizes taxpayers for failure to remit their taxes in timely fashion, thus requiring them to pay first and obtain review of the tax's validity later in a refund action, the Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional." (*McKesson, supra,* 496 U.S. at p. 22 [110 L.Ed.2d at pp. 26–27].)

Relying on *McKesson*, plaintiff asserts it too was denied a meaningful opportunity for relief by virtue of the fact that the Commission ceased to exist and there was no way to collect the judgment it was owed. It urges that because there was no predeprivation remedy, it is only by making defendants responsible for this obligation that plaintiff's due process rights can be protected. There are two major problems with plaintiff's position.

First, unlike the plaintiff in *McKesson*, plaintiff here did not pay the assessments under compulsion but instead paid them pursuant to a stipulated

judgment. As we have already outlined, plaintiff settled its lawsuit in federal court in 1999 by entering into a stipulation and order for judgment and dismissal. In this agreement, the parties stated they had "met and conferred and agreed to settle and resolve their disputes and differences reflected in and arising from this action[.]" Plaintiff agreed to dismiss its complaint with prejudice, pay $10,000 to the Commission as attorney fees and costs, and "become current as to all assessment payments and reports under Commission Law." It also stipulated "to an order of permanent injunction and/or judgment mandating compliance with Commission Law relative to reporting and payment of assessments in a timely manner." This injunction was to remain in effect "unless subsequently modified and/or dissolved by Court order or upon cessation of the California Egg Commission."

On June 9, 1999, the federal district court entered its order and judgment in accordance with this stipulation, finding that the stipulation "was executed only after all parties . . . had the opportunity to consult with legal counsel and that the parties have voluntarily and intentionally entered into the Stipulation."

Plaintiff asserts that its payments under this order were made under duress. It suggests that any payments made pursuant to a court order are involuntary because nonpayment risks imposition of sanctions for contempt. Plaintiff also contends that it agreed to this stipulated judgment only because it did not think it would prevail at trial. Payments made to cut one's losses, according to plaintiff's philosophy, are payments made under compulsion. We do not agree.

Plaintiff, who was represented by counsel, made a calculated tactical decision not to pursue its case and instead stipulate to pay the assessments. Plaintiff bears the consequences of that decision. In hindsight, plaintiff "may wish that it had not made this deal, but courts have not looked favorably on the entreaties of parties trying to escape the consequences of their own 'counseled and knowledgeable' decisions." (*Coltec Industries, Inc. v. Hobgood* (3d Cir. 2002) 280 F.3d 262, 274.) By entering into the stipulated judgment, plaintiff voluntarily agreed to pay its assessments. These payments were the product of agreement, not compulsion or duress.

But even if we were to conclude otherwise, *McKesson* is distinguishable from plaintiff's case in another critical respect. In *McKesson*, the plaintiff sought a refund of taxes from the entity to whom it had paid the taxes: it paid the challenged excise tax to the State of Florida and then sought to recover

those funds from the State of Florida. (See *McKesson, supra,* 496 U.S. at pp. 23–25 [110 L.Ed.2d at pp. 27–28].) The same is true in other cases cited by plaintiff, such as *Jordan v. Department of Motor Vehicles* (1999) 75 Cal.App.4th 449, 466 [89 Cal.Rptr.2d 333], and *General Motors Corp. v. City and County of San Francisco* (1999) 69 Cal.App.4th 448, 454 [81 Cal.Rptr.2d 544], each of which involved claims for refunds made to the party to whom fees and taxes had been paid. Here, however, plaintiff seeks a refund from an entity that never received payment from plaintiff. Plaintiff paid the assessments to the Commission, but seeks a refund from the State. The State did not collect the assessments and therefore has nothing to refund. Under these circumstances, plaintiff is actually seeking damages, not a refund.

■ "The distinction between money damages and specific monetary relief is that 'damages are given to the plaintiff to *substitute* for a suffered loss . . . . [S]pecific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he is entitled." ' " (*Cal-Almond, Inc. v. Department of Agriculture* (9th Cir. 1995) 67 F.3d 874, 878 (*Cal-Almond*).)

But plaintiff is precluded from recovering damages against the State for the Commission's debt by virtue of section 75070. As already noted, this statute provides: "The state shall not be liable for the acts of the [C]ommission or its contracts. Payments of all claims arising by reason of the . . . acts of the [C]ommission are limited to the funds collected by the [C]ommission." Requiring the State to pay a judgment owed by the Commission is tantamount to awarding damages against the State in derogation of the immunity afforded by section 75070.

*Cal-Almond* is instructive. In an earlier decision, the appellate court held that the free speech and free association rights of almond handlers had been violated by the assessment scheme governing the almond industry. (*Cal-Almond, Inc. v. U.S. Dept. of Agriculture* (9th Cir. 1993) 14 F.3d 429, 433–440.) On remand, the trial court ordered the United States Department of Agriculture (USDA) to refund not only the funds that it had collected but also to refund amounts that the handlers had paid to third parties for creditable advertising as permitted under the assessment system. (*Cal-Almond, supra,* 67 F.3d at p. 877.) In *Cal-Almond,* the Ninth Circuit Court of Appeals concluded that reimbursing the handlers for funds paid to third parties constituted damages, not specific relief, and therefore was barred by the doctrine of sovereign immunity. (*Id.* at p. 878.) The court explained: "Requiring the USDA to reimburse the handlers for money they expended on creditable advertising would oblige the USDA to 'substitute' money from its coffers for money the handlers had paid to third parties. Unlike the assess-

ments paid directly to the Board, in the situation of the money paid for creditable advertising, the USDA cannot return the 'precise property wrongfully taken' because that money was not paid to the USDA. Reimbursement for the money handlers spent on creditable advertising would therefore constitute damages. Since nothing in the [legislative enactments] demonstrates congressional intent to waive sovereign immunity for the claims raised by the handlers, [citation], the handlers' claims for reimbursement for money spent on creditable advertising are barred by sovereign immunity." (*Cal-Almond, supra,* 67 F.3d at p. 878.)

The same is true here. Plaintiff seeks relief not from the Commission to whom it paid the assessments, but from the State. Consequently, the remedy sought is not a refund, but damages. But section 75070 specifically immunizes the State from liability for acts of the Commission and limits payment of claims to the funds collected by the Commission. As in *Cal-Almond,* plaintiff's claim cannot succeed in light of statutory immunity provisions.

Plaintiff asserts that section 75070 does not apply in this case because the Commission is a state-created entity that provided a direct benefit to the State. Under these circumstances, plaintiff suggests, the State should be held liable for the judgment the Commission owes to plaintiff under something akin to a vicarious liability or alter-ego theory. Even if these theories might be appropriate in certain situations, the factual predicate for such a claim is not present here. The Commission was an independent entity and did not provide a direct benefit to the State sufficient to warrant the imposition of liability.

■ Plaintiff overreaches in asserting that because the Commission was created as an entity in state government (§ 75051), defendants are necessarily liable for the Commission's financial obligations. The fact that the Commission is a creation of the State does not mean that the State is automatically responsible for the Commission's acts any more than the State would be automatically responsible for a county's acts or those of any statutorily-created entity. As one court noted in determining whether a state agency could invoke the state's Eleventh Amendment immunity, "[l]abeling an entity as a 'state agency' in one context does not compel treatment of that entity as a 'state agency' in all contexts." (*Lynch v. San Francisco Housing Authority* (1997) 55 Cal.App.4th 527, 534 [65 Cal.Rptr.2d 620].) "It is the relationship between the entity and the state, not the label attached to the entity, that determines whether the Eleventh Amendment would shield that entity from suit in federal court." (*Id.* at p. 536.)

A review of the statutory scheme governing the Commission demonstrates the Commission's independence from the Department. Eight of the Commis-

sion's nine members are elected by handler members. (§ 75051.) The ninth, a public member (see *id.*), is appointed by the Department director from a list of nominees recommended by the Commission. (§ 75052.) Handlers also elect three alternate members of the Commission. (§ 75058.) The Commission itself elects replacements to fill any midterm vacancies. (§ 75059.)

The Commission is a corporate body with the power to sue and be sued, and to enter into contracts. (§§ 75064, 75092.) The Commission controls its finances. Any funds the Commission receives, including assessments paid by handlers, are to be deposited into a bank account designated by the Commission, and those funds "shall be disbursed by order of the [C]ommission through the agent or agents that it designated for that purpose." (§ 75069.) The Commission can incur expenses, create liabilities and borrow funds in advance of receipt of assessments. (§ 75088.) It can accept contributions for the purpose of carrying out its activities. (§ 75092.5.)

The Commission is empowered to adopt its rules and regulations (§ 75082), and administer and enforce its activities. (§ 75083.)

The Department plays a narrowly circumscribed role in the Commission's activities. The Department director sits on the Commission, but only as an ex officio member. (§ 75053.) His or her authority over the Commission's activities is limited to the ability to "require the [C]ommission to correct or cease any existing activity or function which is determined by the director not to be in the public interest or which is in violation of this chapter." (§ 75054, subd. (a).) If the Commission does not comply with such a directive, the director may suspend all or a portion of the Commission's activities. (§ 75054, subd. (b).)

█ In short, the Commission enjoys broad authority, independent of the Department. Given this independence, there is no basis to make the State liable for the Commission's activities. (Cf. *ITSI TV Productions v. Agricultural Associations* (9th Cir. 1993) 3 F.3d 1289, 1292 [outlining factors for determining whether a state agency is an arm of the state for purposes of Eleventh Amend. immunity].)

Plaintiff argues that liability is proper because the State directly benefits from the Commission's activities and, as evidence of the State's interest, it points to several statements included in the statutes creating the Commission. For example, section 75001 recognizes that the "maintenance and expansion of the market for eggs is vital to the economy of California." Section 75003 declares it to be state policy "to aid in the handling of eggs and egg products,

to develop more efficient and equitable methods in handling, and to maintain job security for workers in the egg industry." Similarly, section 75004 provides: "The production of eggs and egg products in this state and the marketing of eggs and egg products in this state, regardless of their point of origin is hereby declared to be affected with a public interest. This chapter is enacted in the exercise of the police power of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state."

These general statements do not link defendants to the Commission's activities to such an extent that vicarious liability is constitutionally compelled. The benefits flowing to the State from the Commission's operation are indirect, and do not provide support for declaring section 75070 unconstitutional as applied in this case.

■ The trial court found it troubling that the one source from whom plaintiff could claim a refund, the Commission, is out of business and without assets. We too acknowledge the difficult position in which plaintiff finds itself. But as the Ninth Circuit observed in *Cal-Almond*, the application of immunities sometimes precludes relief: "Our analysis regarding sovereign immunity leads us to a somewhat awkward result: although the handlers' compelled expenditures on creditable advertising violated their First Amendment rights, there is no individual remediation available for those violations. Despite the celebrated dictum in *Marbury v. Madison* [5 U.S. 137 [2 L.Ed. 60]], in the law of modern constitutional remedies, not every right comes equipped with a guarantee of individual remediation for every violation of that right. As this case demonstrates, the doctrine of sovereign immunity provides a formidable limitation on the availability of individual remedies." (*Cal-Almond, supra,* 67 F.3d at p. 879.) The same can be said here of section 75070.

Plaintiff raises one additional claim that merits only a cursory response. Throughout its reply brief, plaintiff asserts that section 75070 violates California Constitution, article XIII, section 32. This contention was not raised in the trial court or in plaintiff's opening brief, and plaintiff offers no explanation for either omission. Consequently, this issue is not properly before us and we do not consider it. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

## Disposition

The judgment is affirmed. Defendants are awarded their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 2005. Werdegar, J., did not participate therein.