**BERNE CORP. and B&B Corp., Twenty-One Queens Quarter, Inc., Miller Properties, Inc., Equivest St. Thomas, Inc., Robert Schmidt, Kim Holdsworth, Robert Schmidt Development Corp., and Dori P. Derr, The Cyril V. Francois Associates, LLC, Shell Seekers, Inc., Charles W. Consolvo, Linda B. Consolvo, Snegle Gade Associates LP, Charles W. Consolvo as Trustee of the Yvette B. Lederberg Trust, Arthur B. Choate, Stewart Loveland, and Stacy Loveland, Elizabeth Sharp, Lindon Corp., Gordon L. Coffelt, Soraya Diase Coffelt, and One Stop, Inc., Plaintiff**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, BERNADETTE WILLIAMS, in her official capacity as Tax Assessor, and the Board of Tax Review, Defendants**

Civil Nos. 2000-141, 2000-167, 2001-151, 2001-155, 2001-181, 2001-196, 2001-197, 2001-228, 2002-057

District Court of the Virgin Islands

Division of St. Thomas

February 17, 2010

JAMES M. DERR, ESQ., St. Thomas, USVI, *For the plaintiffs Berne Corp., B&B Corp., Miller Properties, Inc., Robert Schmidt, Robert Schmidt Development Corp., Kim Holdsworth, Dori P. Derr, and Elizabeth Sharp.*

CHAD C. MESSIER, ESQ., St. Thomas, USVI, *For plaintiff Equivest St. Thomas, Inc.*

SORAYA DIASE-COFFELT, ESQ., St. Thomas, USVI, *For plaintiffs Lindon Corp., Gordon L. Coffelt, Soraya Diase Coffelt, and One Stop, Inc.*

DAVID A. BORNN, ESQ., St. Thomas, USVI, *For plaintiffs The Cyril V. Francois Associates, LLC and Twenty-One Queen Quarter, Inc.*

CAROL THOMAS-JACOBS, ESQ., St. Thomas, USVI, *For the defendants.*

GÓMEZ, *Chief Judge*

## MEMORANDUM OPINION

(February 17, 2010)

Before the Court is the motion of the defendants, the Government of the Virgin Islands (the "Government"); Bernadette Williams[1], in her official capacity as Tax Assessor ("Williams"); and the Board of Tax Review (the "Board") (collectively referred to as the "Defendants"), to lift or modify a permanent injunction issued by this Court, enjoining the collection of real property taxes at rates above those for the 1998 calendar year, and to dismiss these actions. The Defendants seek relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure ("Rule 60(b)").

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action was initiated by owners of commercial real estate in the Virgin Islands subject to commercial real property taxes assessed by the Government of the Virgin Islands. Plaintiffs alleged violations of 48 U.S.C. § 1401 (repealed 2007) ("the 1936 act"), which mandated that real estate tax assessments for the territories be at "actual value." They

---

[1] Federal Rule of Civil Procedure 25(d) ("Rule 25(d)") provides that, "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Bernadette Williams has assumed the position of Tax Assessor and succeeds former Tax Assessor, Roy Martin. Pursuant to Rule 25(d) she is substituted in Martin's place as a party to this action.

also alleged violations of the Revised Organic Act of 1954, 48 U.S.C. § 1541, and infringements of their procedural and substantive due process rights under the Fourteenth Amendment of the United States Constitution. The Court preliminarily enjoined the Government and tax assessor Roy Martin ("Martin") from assessing and collecting commercial property taxes in violation of the 1936 Act.

Following the Court's ruling, the parties negotiated a settlement (the "Berne Settlement"), which the District Court approved on December 19, 2000. The Government agreed to implement a new real property tax assessment system pursuant to the Berne Settlement.

On May 12, 2003, the Court found that the Defendants had materially breached the Berne Settlement and ordered that it be specifically performed. *Berne Corp. v. Gov't of the V.I.* (*Berne II*), 262 F. Supp. 2d. 540, 575 (D.V.I. 2003). Moreover, the Court issued a decree ("the May 12, 2003 Decree") enjoining the Defendants from requiring the payment of real property tax bills.

The Court required two primary conditions be met before the Government could assess real property and issue tax bills. The first condition was the establishment of a property tax system that reliably and credibly assessed and taxed all real property based on its actual value. *Id.* The second condition was the requirement that the Government demonstrate to the Court's satisfaction that it has a functioning Board of Tax Review that consistently holds hearings and makes determinations on appeals. *Id.*

The Court made the injunction of the assessment and collection of tax bills applicable to all real property taxpayers in the Virgin Islands. *Id.* at 572. However, the Court held that the Government could issue bills to non-party taxpayers based on the assessment values for the 1998 calendar year reflected in the 1999 tax bills if it provided a mechanism to adjust the assessments and bills retroactively. *Id.* Thereafter, the Legislature of the Virgin Islands passed Act No. 6586 ("Act 6586") which provided such a mechanism. It authorized the Tax Assessor to issue tax bills and collect taxes at the 1998 assessment level for all classes of real property for the tax years 1999, 2000, 2001, 2002, 2003 and 2004 before a fully compliant tax system was instituted. Act 6586 also provided that the tax due would be subject to adjustment for each year once a new tax system was implemented. Accordingly, in August 2003, the Court modified the May 2003 Decree to allow the Government to collect property taxes based on

the 1998 assessment levels. *In re Tax Litig.*, 276 F. Supp. 2d 435, 436 (D.V.I. 2003).

On June 29, 2007, Congress repealed the 1936 Act. Congress made the repeal retroactive to July 22, 1954. In response to the repeal, the Defendants filed a motion to vacate the May 2003 Decree. Before this Court ruled on the status of the May 2003 injunction, on March 10, 2008, the Governor of the Virgin Islands signed into law Act No. 6991 ("Act 6991").

Act 6991 amends or repeals several sections of Title 33 of the Virgin Islands Code, which sets forth the laws governing taxation and finance in the territory. Among other things, the act authorized Martin to issue real property tax bills for the year 2006 during the 2008 fiscal year. In accordance with Act 6991, the Government issued real property tax bills for 2006.

After a hearing, the Court issued an Order on September 11, 2008, finding the Government in contempt of the May 12, 2003 Decree for its issuance of the 2006 tax bills in violation of the requirements of the injunction. On that same day, the Court also ordered vacatur of the part of the May 12, 2003 Decree that relied upon the 1936 Act but retained jurisdiction over the rest of the May 12, 2003 Decree, which ordered reform of the Board of Tax Review.

The Government challenged the Court's jurisdiction and its contempt Order. The Third Circuit affirmed this Court's Orders finding the Government in contempt of the May 12, 2003 Decree, and vacating the part of the Decree that relied upon the 1936 act. Commenting on the Board of Tax Review, the Third Circuit noted that, "we agree with the District Court's application of fact to law — that the Board of Tax Review's functionality did not meet constitutionally required due process standards." *Berne Corp. v. Gov't of the V.I.*, 570 F.3d 130, 139, 51 V.I. 1253 (3d Cir. 2009). The Government now moves to vacate or modify the Court's May 12, 2003 Decree and Order enjoining the collection of real property taxes at rates above the 1998 assessments. In hearings held on September 17, 2009 and October 15, 2009, the parties presented evidence about the functioning of the Board of Tax Review.

## II. DISCUSSION

▮ Rule 60(b) of the Federal Rules of Civil Procedure provides, in pertinent part:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

. . . .

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b)(5). A Rule 60(b)(5) motion may be granted "when the party seeking relief from an injunction . . . can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992)). "A court may grant relief under 60(b)(6) only under extraordinary circumstances." *Heirs of Guerra v. United States*, 207 F.3d 763, 767 (5th Cir. 2000).

## III. ANALYSIS

### A. The Requirement to Have a Functioning Board of Tax Review

The May 12, 2003 Decree requires that, prior to the issuance of any tax bills that reflect a rate other than the 1998 rate, the Board of Tax Review must (1) consistently hold hearings on appeals, and (2) make timely decisions on those appeals. A functioning Board of Tax Review was the remedy determined for the Government's constitutional due process injury. The Defendants seek a modification or vacatur of the Decree pursuant to Federal Rule of Civil Procedure 60(b)(5) and (6).

 Rule 60(b)(5) "empowers a court to modify a judgment only if it is 'prospective,' or executory." *Marshall v. Bd. of Educ.*, 575 F.2d 417, 425 (3d Cir. 1978) (finding that a judgment for monetary damages that had been paid was not prospective). "A 'prospective' injunction envisions a restraint of future conduct, not an order to remedy past wrongs when the compensation payment is withheld from the beneficiaries until some subsequent date." *Id.* at 425 n.27.

 The Supreme Court has explained that because Rule 60(b)(5) "encompasses the traditional power of a court of equity to modify its

decree in light of changed circumstances," *Frew v. Hawkins*, 540 U.S. 431, 441, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004), the Court "should apply a 'flexible standard' to the modification of consent decrees when a significant change in facts or law warrants their amendment." *Id.* (citing *Rufo*, 502 U.S. at 393). Under that standard, "[a] party seeking modification of an [injunction] may meet its initial burden by showing a significant change either in factual conditions or in law." *Rufo*, 502 U.S. at 384. If the moving party meets that burden, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383. The Supreme Court has advised that a "court cannot be required to disregard significant changes in law or facts if it is satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong." *Federation No. 91 v. Wright*, 364 U.S. 642, 647, 81 S. Ct. 368, 5 L. Ed. 2d 349 (1961) (internal quotation marks omitted). Moreover, the Court has admonished that "[a] court errs when it refuses to modify an injunction or consent decree in light of [significant] changes." *Agostini*, 521 U.S. at 215.

█ Here, the Court must determine if the reforms to the Board of Tax Review have amounted to a significant change in the facts which would warrant modification of the May 12, 2003 Decree. The critical inquiry is whether the Board is functioning at a level that provides taxpayers due process. At the very least, due process secures for a taxpayer the right to a "full hearing and judicial determination at which she may raise any and all constitutional objections to the tax." *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 514, 101 S. Ct. 1221, 67 L. Ed. 2d 464 (1981) (citation omitted).

On July 2, 2008 the Court held an evidentiary hearing on the Board's functionality. Following that hearing, the Court noted that while the Board was "functioning to some degree. . . . major aspects of the Board's operations leave the Court with significant doubts about its functioning." *Berne Corp. v. Gov't of the V.I.*, 50 V.I. 655, 674 (D.V.I. 2008). The record did not show evidence of a consistent system for the Board to manage its docket to efficiently resolve pending appeals. *Id.* Further, there was no evidence that the Board was maintaining reliable records. *Id.* The hearings held by the Board did not demonstrate consistency. *Id.* There was no proof

of the Board making determinations on appeals and timely remitting refunds connected to appeal decisions.[2] *Id.*

The Court also found disconcerting the mere two Board meetings that had taken place since January 31, 2007, "held within four-weeks of each other and immediately before a hearing on the Board's compliance." *Id.* at 676. The Court acknowledged good faith steps made to reform the Board's operations. *Id.* at 676. However, it concluded that "the Board's attempts to comply with the May 12, 2003 Decree have been sporadic, short-lived, and of recent vintage," and failed to bring the Board's functioning to the level required by the Decree. *Id.*

The Government asserts that the Board of Tax Review has made strides in the period since the last evidentiary hearing and is now functioning at " 'constitutionally required levels.' " (Defs. Mot. to Lift or Modify Permanent Inj. 3) (quoting *Berne*, 570 F.3d at 138). In support of its position, the Government presented the testimony of Walter Challenger ("Challenger"), Executive Director of the Department of Finance, at the September 17, 2009 hearing. Challenger testified that in the period between this Court's June 19, 2008 evidentiary hearing in this matter and the September 17, 2009 hearing, the Board of Tax Review had held ten hearings, all with a quorum present. He stated that all appellants with appeals heard by the Board were sent written notice of the hearing date prior to hearings being held, and only matters of taxpayers who had received notice were placed on the agenda for hearings. Challenger further noted that the Board of Tax Review had hired a full-time Hearing Officer to conduct evidentiary hearings on appeals. Additionally, he testified that the Hearing Officer had held eight hearings.

Other individuals associated with the Board of Tax Review also testified as to the current state of the Board's operations. Jeanelle Roberts ("Roberts"), Board of Tax Review administrative specialist, testified that incoming appeals are being entered, noted in the Board's Excel spreadsheet register, and tracked. The Commissioner of the Department of Finance, Angel Dawson, Jr. ("Dawson"), testified that taxpayer-appellants are receiving refunds in a timely manner.

---

[2] A prevailing taxpayer-appellant in an appeal may be entitled to a refund. 33 V.I.C. § 2451 requires that the Tax Assessor "shall refund any excess taxes paid within 30 days of the judgment of the Board of Tax Review." 33 V.I.C. § 2451.

The Government has taken actions that appear to specifically respond to this Court's assessment of the Board's functioning on September 11, 2008. The Department of Finance summarized the Board of Tax Review's activities from July 2008 to June 2009 in a Report of the Board of Tax Review ("Report"). The Report states that the Board and its Hearing Officer have sent out notices to appellants in advance of hearings. The Board has met more frequently, and always with a quorum present. The Board has reached a decision in 213 of the 277 appeals heard during the period from July 2008 to June 2009. (Report of the Board of Tax Review, Ex. A Defs.' Motion to Lift or Modify Permanent Inj. 1-2.) The Hearing Officer began hearing appeals in February 2009. She scheduled the hearing of 53 appeals for appeals of the 2006 tax year assessments. As to 10 of these appeals, she made recommendations and submitted them to the Board of Tax Review for determination. (*Id.* at 2.)

Notwithstanding the progress to which the Government directs the Court, a complete review of the record provides a more sobering account of the Board of Tax Review's performance. An Amended Report of the Board of Tax Review ("Amended Report"), prepared by the Department of Finance and dated August 7, 2009, indicates that 112 appeals remain pending before the Board of Tax Review:

| Year | Appeals |
| --- | --- |
| 1998 | 23 |
| 1999 | 16 |
| 2000 | 16 |
| 2001 | 17 |
| 2002 | 8 |
| 2003 | 7 |
| 2004 | 12 |
| 2005 | 13 |

(Amended Report of the Board of Tax Review, Pls.' Ex. V, Hr'g Sept. 17, 2009.)

The Plaintiffs questioned Challenger about the longest standing of these appeals:

Q: And this document then indicates that as of August 7th . . . there were 23 pending appeals from 1998, which would make them somewhere around 11 years old, correct?

A: Correct.

Q: And 16 pending appeals from 1999 that would be about 10 years old?

A: Correct.

Q: And 16 appeals from 2000 that would be around 9 years old?

A: Correct.

(Hr'g Tr. at ____ , September 17, 2009.)

Subsequent to its Amended Report, the Board of Tax Review held hearings on August 14, 2009 and August 28, 2009 ("the August 2009 hearings"). The hearing summaries from the August 2009 hearings represent that the Board of Tax Review disposed of 36 of the 1998 appeals during its August 2009 hearings. While there is some dispute about the number of 1998 appeals that were disposed of and the means by which the taxpayers were given notice, it is undisputed that appeals from as far back as 1999 and 2000 still remain pending. Indeed, Challenger testified that long deferred appeals from that time remain unresolved:

Q: . . . [F]or 1999 . . . a total of four appeals . . . have been pending for 10 years now, correct?

A: Yes.

Q: And for 2000 . . . a total of 9 appeals . . . have been pending for around 9 years?

A: Yes.

(*Id.* at — .)

Challenger's unflattering disclosure was reinforced by the testimony of Jeanelle Roberts and Commissioner Angel Dawson. Indeed, Ms. Roberts revealed as much when questioned by the Court:

THE COURT: [I]s there a register that would indicate all pending appeals, not just for 2006? My question is not limited to 2006.

THE WITNESS: There is a register that indicates pending appeals.

THE COURT: All right. And that would be all pending appeals, is that right?

THE WITNESS: All pending appeals.

THE COURT: All right. On that list are there any appeals that have been pending for longer than 30 days?

752

THE WITNESS: Prior to 2006, yes.

THE COURT: All right. Are there any appeals on that list that have been pending for more than 60 days?

THE WITNESS: Prior to 2006, yes.

. . .

THE COURT: Are there any appeals on that list that have been pending for more than 120 days?

THE WITNESS: Prior to 2006, yes.

. . .

THE COURT: All right . . . are there any appeals on that list that have been pending for more than 2 years?

THE WITNESS: Prior to 2006, yes.

THE COURT: All right. To your knowledge, what is the longest pending appeal on the list?

THE WITNESS: I can't really say.

(*Id.* at — .)

It can hardly be argued that those taxpayer-appellants have received a timely hearing. Moreover, the Board of Tax Review has no established procedure for determining the order in which these backlogged appeals will be heard. For instance, at the September 17, 2009 hearing, Dawson was questioned about the Board's management of backlogged appeals:

THE COURT: All right. So is it the case that the first in, the first appeal in is the first one that's up for a hearing?

THE WITNESS: I'm not going to represent that that is consistently so, Your Honor.

THE COURT: All right. Is there some protocol or procedure that is available for review on how that's done? That is, you schedule the oldest appeals first or not?

THE WITNESS: Well I'll be perfectly honest with you, being relatively new to both roles, the — as the administrative overseer, as Commissioner of Finance, at the Office of the Board of Tax Review, as well as Chairman of the Board, I'm looking at all areas in terms of possibility for improvement, including documentation, policies, protocols, things of that sort. So that is presently being reviewed and undertaken.

THE COURT: Well, my question, to you though, is a little bit different. My question is, is there some protocol now? Yes or no.

THE WITNESS: No formal protocol that I'm aware of.

(*Id.* at — .)

To its credit, the Government has implemented some of the familiar markers of due process, including providing notice of hearings and scheduling hearings. Notwithstanding those inroads, the conditions that motivated this lawsuit have still not been completely addressed. In spite of administrative progress and more frequent hearings, taxpayers with appeals pending for ten years still have not been provided a full hearing at which to raise their objections to the real property taxes they challenge. If the Board of Tax Review is unable to provide due process to its longest suffering taxpayer-appellants, it cannot claim to function at constitutionally required levels.

## B. Uniform Standards of Professional Appraisal Practice

■ "A critical question in [a] Rule 60(b)(5) inquiry is whether the objective of the . . . . [underlying] order . . . has been achieved." *Horne v. Flores*, 129 S. Ct. 2579, 2595, 174 L. Ed. 2d 406 (2009). In applying equitable principles during this evaluation, the Court undertakes a holistic review of the challenged order. To that end, the Court will now address the status of the Uniform Standards of Professional Appraisal Practice ("USPAP") which have been linked to the May 12, 2003 Decree and which continue to be a source of much contention.

USPAP was first discussed in the December 19, 2000 Settlement Agreement between plaintiffs, the Berne Corporation and B&B Corporations, and the Defendants. *See Berne II*, 262 F. Supp. 2d at 548. In the Berne Settlement, the parties agreed to select a special master to " 'review the procedures and process to be used by the Virgin Islands Tax Assessor's office in appraising commercial properties pursuant to a mass appraisal approach and Uniform Standards of Professional Appraisal Practice . . . .' " *See id.* (quoting the Berne Settlement).[3]

At the October 15, 2009 hearing, the Court heard argument from the parties about the continuing applicability of USPAP. Additionally, at the

---

[3] In a December 19, 2000 Order, this Court approved the Berne Settlement. The violation of that Order precipitated the issuance of the May 12, 2003 Decree.

request of the Court, the parties submitted supplemental briefings regarding the effect on a private settlement agreement when the legal impetus for that settlement is repealed.

In its May 2003 Decree, the Court ordered the Government to comply with two significant directives. The first directive enjoined the Tax Assessor from appraising and assessing any real property in the Virgin Islands until he had adjusted the appraisal system to comply with the 1936 act. The second directive enjoined the Government to establish "a functioning Board of Tax Review that consistently holds hearings and reaches determinations on appeals." *Berne*, at 662. It is the first directive that seems to give rise to the current dispute about the continuing validity of the USPAP requirements.

The Plaintiffs contend that the Court's partial vacatur Order resulted in deletion of the references to the 1936 Act in the May 12, 2003 Decree but left intact the remaining portions of the Decree. They argue that among the enduring requirements was the mandate that the Defendants comply with the terms of the Berne Settlement, including its provision for the application of USPAP to the Defendants' tax assessment practices. Specifically, they highlight Section 4 of the May 12, 2003 Decree, which states:

> 4. **DECREED** that the Government of the Virgin Islands and Roy Martin, in his official capacity as Tax Assessor of the Virgin Islands, shall fully, promptly, and diligently comply with all the conditions and perform all the terms of the settlement agreement entered into with the plaintiffs in *Berne Corp. v. Government of the Virgin Islands,* Civil 2000-141, and 21 *Queens Quarter v. Government of the Virgin Islands,* Civil No. 2000-167 [*"Berne* Settlement Agreement"].

*Berne II,* 262 F. Supp. 2d at 576.

The Defendants reject the continuing applicability of the Berne Settlement. They note that the Court's partial vacatur Order vacated all portions of the May 12, 2003 Decree except the portion requiring a functioning Board of Tax Review. The Defendants assert that the Berne Settlement in no way bears on the functioning of the Board of Tax Review. They instead argue that the 1936 Act was the predicate for the Berne Settlement. In light of the Court's partial vacatur Order, the Defendants assert that all portions of the Berne Settlement related to the 1936 Act have been rendered ineffective.

■ The Plaintiffs' argument is wanting as it inappropriately conflates the raison d'etre for two distinct processes: tax appeals as administered by the Board of Tax Review and tax appraisals as contemplated by USPAP. The proceedings that occur before the Board of Tax Review constitute a distinct part of the tax system. The Board of Tax Review provides a forum for taxpayers to challenge issues related to property taxes. It is the availability of due process in that forum that the Court is tasked with reviewing.

■ USPAP governs the appraisal of real property and the determination of real property tax values. Though problematic appraisals may be raised in a Board of Tax Review hearing, the effectiveness of the Board of Tax Review as a forum that provides due process to taxpayers may be adjudged without necessarily probing into the underlying appraisal methods. Significantly, the USPAP requirements remain relevant primarily as a function of the Berne Settlement's objective to ensure appraisal in accordance with the 1936 Act. Therein lies the rub to the Plaintiffs' argument — the underlying basis for the USPAP requirements in the Berne Settlement was removed with the repeal of the 1936 act.

■ In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992), the Supreme Court noted that pursuant to Rule 60(b)(5) "[a] party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or law." *Id.* at 384. The Court stated that a modification of a consent decree may be justified when a change in statutory or decisional law makes lawful what the consent decree was established to restrict. *Id.* at 388.

In *Brown v. Tenn. Dep't of Fin. and Admin.*, 561 F.3d 542 (6th Cir. 2009), the Sixth Circuit extended the *Rufo* rule to a private settlement agreement.[4] That case involved a settlement agreement that was the product of a § 1983 suit brought by a class of mentally disabled Tennessee residents. The plaintiffs claimed that Tennessee was violating Medicaid law because individuals eligible for either services in an Intermediate Care Facility for the Mentally Retarded (ICF/MR) or through Tennessee's "home and community based services" Medicaid waiver program under

---

[4] In a footnote, the Sixth Circuit's opinion highlighted the fact that the district court retained jurisdiction over the settlement agreement " 'for all purposes,' " and therefore, deemed the settlement agreement the functional equivalent of a consent decree. 561 F.3d at 546 n.2.

the Medicaid Act, were being denied access to waiver services.[5] The parties reached a settlement agreement, wherein Tennessee agreed to retool its programs to respond to some of the alleged Medicaid deficiencies.

Subsequently, the Sixth Circuit in *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006) ("*Westside Mothers II*"), expressly addressed a state's duty to provide "medical assistance" under the terms of the Medicaid statute. The Sixth Circuit held that Medicaid merely required a state to provide financial assistance to beneficiaries seeking medical assistance and did not give rise to a duty to directly provide medical services. 454 F.3d at 539-41.

Tennessee then moved to vacate the order approving its settlement agreement because it argued that *Westside Mothers II* established that a state does not have an obligation to guarantee access to waiver services under the Medicaid Act. The district court denied the motion to vacate in its entirety. It reasoned that *Westside Mothers II* did not alter the contractual duties that parties agreed to in a private settlement. On appeal, the Sixth Circuit noted that:

> [T]he fact that Tennessee settled this case is beside the point. What matters under *Rufo* is not that Tennessee agreed to take the actions specified in the settlement, but what those actions were intended to remedy: if the settlement was premised on the understanding that the Medicaid statute imposed upon Tennessee a duty to ensure the provision of medical services, then *Rufo* counsels that we vacate the agreed order because *Westside Mothers II* established that no such duty exists.

---

[5] Medicaid is a federal "grant-in aid" program. In exchange for federal funds, states administer state Medicaid plans that meet the approval of the U.S. Department of Health and Human Services. Medicaid requires that a state plan must make "medical assistance" available to Medicaid beneficiaries. §§ 1396a(a)(8), 1396a(a)(10).

Congress has established a waiver system, wherein, states can be excused from certain Medicaid requirements in providing approved community care programs. 42 U.S.C. § 1396n(c)(3). One such waiver program is the Home and Community Based Services ("HCBS") waiver program. It offers a number of noninstitutional care choices for Medicaid beneficiaries who would rather live at home or in the community than in an institution. *Sanchez v. Johnson*, 416 F.3d 1051, 1054 (9th Cir. 2005). The waiver program at issue in *Brown* was such a program. The number of individuals who could receive services through that waiver program was capped at a number proposed by Tennessee and authorized by Federal Center for Medicaid Services in the Department of Health and Human Services. 561 F.3d at 544 n.1.

*Brown v. Tenn. Dep't of Fin. and Admin.*, 561 F. 3d at 546 (footnote omitted). Given the change in decisional law, the Sixth Circuit in *Brown* held that the district court erred in refusing to modify the agreement in any way. *Id.* at 548. The Court vacated two portions of the settlement agreement regarding the provision of waiver services because they did not "appear to remedy any violation of federal law" given the change in decisional law. *Id.*

When Congress enacted 48 U.S.C. § 1401 in 1936, it provided that "all taxes on real property in the Virgin Islands shall be computed on the basis of actual value of such property . . . ." 48 U.S.C. § 1401, 49 Stat. 1372 *repealed by* Act June 29, 2007, P.L. 110-40, § 1(a), 121 Stat. 232. Pursuant to that statute, the local Legislature enacted 33 V.I.C. § 2404(a) (amended 2008). 33 V.I.C. § 2404(a) outlined factors to be taken into account in calculating actual value: "(1) location and surroundings; (2) quality of fertility; (3) condition of structures; (4) recent cost to the present owner; (5) recent sale of adjacent property; (6) recent bona fide purchaser; (7) accessibility; (8) proximity to public facilities, conveniences and utilities; (9) rental or income derived directly from the property."

The Plaintiffs contend that in fashioning the Berne Settlement, the parties elected to use USPAP because the "federal statute contained no procedure for determining 'actual value' and the local statute . . . would not result in a determination of 'actual value' as that term is understood in the appraisal community. . . ." (James Derr Aff. ¶ 12, Attach. 1 Pls.' Supplemental Post-Hr'g Mem.). They further assert that constitutional principles of due process and equal protection formed the basis of the Berne Settlement, and not the now repealed 48 U.S.C. § 1401a. However, in the Berne Plaintiffs' original complaint, claims that the tax assessment system violated procedural and substantive due process were linked to the Defendants' failure to adhere to the requirements of 48 U.S.C. § 1401a and 33 V.I.C. § 2404.[6] Moreover, in its May 12, 2003 Memorandum Opinion the Court noted that:

---

[6] The Plaintiffs assert that the primary purpose of the settlement agreement was not to adhere to statutory requirements, but rather to settle on a methodology that would be fair and deal with all property owners equitably, tenets at the core of due process and equal protection. They argue that the Government has not met its burden of proving that 48 U.S.C. § 1401a was the basis for the settlement agreement.

The parties negotiated a settlement of the *Berne* case, which was approved on December 19, 2000. The Government and the Tax Assessor agreed to bring the Virgin Islands real property tax system into compliance with the federal requirement that property be assessed on its actual value, which I have found to be the same as its market value. The parties agreed that the Tax Assessor would develop and implement "the procedures and process to be used by the Virgin Islands Tax Assessor's office in appraising commercial properties pursuant to a mass appraisal approach and Uniform Standards of Professional Appraisal Practice ('USPAP Standards')."

*Berne II*, 262 F. Supp. 2d at 573.

 The analysis in *Rufo* is instructive here. The action the Berne Settlement was designed to remedy was the noncompliance of the Government with the federal statutory requirement that real property taxes be assessed at actual value. The Berne Settlement's provisions that the practices of the Tax Assessor's office align with USPAP, were a means to bring the Government's tax assessment into conformity with 48 U.S.C. § 1401a. With Congress' repeal of 48 U.S.C. § 1401a, the Government's duty to assess real property at actual value no longer exists. This Court's partial vacatur Order already vacated the portions of the May 12, 2003 Decree requiring that real property be assessed in compliance with the 1936 Act. *Rufo* further counsels vacatur of this Court's Order approving the provisions of the Berne Settlement which mandate the Government's compliance with USPAP.

## IV. CONCLUSION

Once again, the Government seeks relief from an injunction occasioned by unconstitutional conduct. It is beyond cavil that before such relief is afforded, the Government must demonstrate that it is functioning at a level at which it is able to provide due process to all taxpayers, including those with longstanding appeals. Unfortunately, the Government is not yet able to do that.

At the September 17, 2009 hearing, the Court asked the Government:

THE COURT: But my question to you is that should the government get this Court's imprimatur because of good efforts, is that good enough, or should the Court give its seal of approval when the matters are resolved? Things are cleared up?

759

MS. THOMAS-JACOBS: Your Honor I think — I don't see any reason why the Court cannot grant a seal of approval at this time, Your Honor.

I think — to — Your Honor to do — to take the position that the Court should not grant the seal of approval until all the matters are resolved and until the Board hears all appeals within 120 days *it's just not possible.*

The government cannot collect taxes. It cannot. . .

(Hr'g Tr. at ___, September 17, 2009) (emphasis supplied).

The Government's position is remarkable in several respects. First, it seeks to give currency to a false premise that it is impossible to satisfy a legal mandate that requires the hearing of tax appeals within 120 days. As a consequence, it seeks the equivalent of a waiver or pardon of its obligation. Second, it suggests the equally false, but more disturbing notion that it cannot collect taxes.

As the Court noted at the hearing, it has not barred the Government from collecting real property taxes:

THE COURT: Almost every hearing I hear that. This Court has not said that the government cannot collect taxes. The Government could collect at the 1998 rates. Could have done it last year or any time. The government chose not to.

(*Id.* at ___ .)

Consistent with the May 12, 2003 Decree, the Government is free to collect real property taxes at the 1998 assessment level. The Government has not availed itself of this option, but instead, seems content to repeat the unfounded assertion that it cannot collect taxes, as if repetition makes it so.

 Moreover, the Government laments circumstances of its own making. The Constitution requires that due process protections be afforded to taxpayers. *See, e.g., McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 36, 110 S. Ct. 2238, 110 L. Ed. 2d 17 (1990) ("Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause.").

760

The Supreme Court has noted that in the tax setting, due process affords taxpayers "not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a 'clear and certain remedy' for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." *McKesson Corp.*, 496 U.S. at 36 (quoting *Atchison et al. v. O'Connor*, 223 U.S. 280, 285, 32 S. Ct. 216, 56 L. Ed. 436 (1992)). For those taxpayer-appellants whose hearing is delayed ten years it can hardly be said that a clear and certain remedy is at hand.

██ The Court's May 12, 2003 Decree, enjoining the collection of real property taxes at a rate other than the 1998 assessment level, was issued to rectify the Government's constitutionally violative practices. The Court's imprimatur then should be given when the Board of Tax Review provides to all taxpayers the process guaranteed for them by the Constitution.

The greater regularity in Board of Tax Review hearings, the institution of a Hearing Officer before whom tax hearings are now being held, and the mailing of notices 30 days in advance of hearings demonstrate improvement. At the same time, the failure to timely hear appeals that have been pending for ten years most assuredly does not. Rather, it bespeaks of inchoate progress.

The Court is mindful of the Government's efforts and its laudable intentions. However, the record in this matter is replete with examples of the Government undertaking unconstitutional conduct, while at the same time professing the best intentions. As such, good intentions now provide an insufficient basis to alter the status quo.

Accordingly, the Court will modify the May 12, 2003 Decree insofar as it requires compliance with USPAP.[7] In all other respects the May 12, 2003 Decree remains unmodified.

The Court will continue to monitor the Board of Tax Review on a biannual basis to determine whether the Defendants are in compliance with the May 12, 2003 Decree. An appropriate Order follows.

---

[7] In the Court's September 11, 2008 partial vacatur Order it vacated the portion of the May 12, 2003 Decree that relied on the 1936 Act. That partial vacatur Order did not end the Government's duty to comply with USPAP pursuant to its obligations under the Berne Settlement. Because the Court now finds that the Government's duty to comply with USPAP requirements under the private Berne Settlement has been obviated, it will modify the May 12, 2003 Decree correspondingly.