**[J-20-2024] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| ALCATEL-LUCENT USA INC., | : | No. 8 MAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 803 FR |
| | : | 2017 dated December 28, 2022, |
| v. | : | sustaining the exceptions filed on |
| | : | October 13, 2021 to the September |
| | : | 13, 2021 Order, Reversing the |
| COMMONWEALTH OF PENNSYLVANIA, | : | decision of the PA Board of Finance |
| | : | and Revenue at No. 1628908 dated |
| Appellant | : | August 23, 2017 and remanding. |
| | : | |
| | : | ARGUED: March 6, 2024 |

## CONCURRING OPINION

**JUSTICE McCAFFERY**                                    **DECIDED: November 20, 2024**

While I cannot disagree with Justice Wecht's conclusion on its face, I conclude that under the *Sunburst* doctrine, the retroactivity of the *Nextel* and *General Motors* decisions is not the dispositive issue here. Nevertheless, I agree with the Majority that Alcatel is not due a total refund of its 2014 tax payments; I do so because the proper remedy under our Uniformity Clause must be rooted in the purpose behind the Clause itself. I therefore write separately to highlight my concerns.

I agree with Justice Mundy that the question before us is most appropriately presented as "do the taxpayers who successfully challenged the law get their money back?" Justice Mundy's Concurring Opinion at *3. To answer that question, we must first recognize that we are applying a provision of the Pennsylvania Constitution that has no counterpart in the federal Constitution. Under the *Sunburst* doctrine, state law, not federal law, controls the question of retroactivity of state court decisions applying state

constitutional protections. *See Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364 (1932). To that extent, I conclude Justice Wecht properly finds that *General Motors* improperly applied the *Chevron* test in assessing retroactivity.

But the *Sunburst* doctrine has larger implications. In *General Motors*, we justified a monetary remedy based on an assumption the Supreme Court of the United States "required states to provide meaningful backward-looking relief to rectify any unconstitutional deprivation if taxpayers are relegated to a [post payment] refund action." *General Motors Corp. v. Commonwealth*, 265 A.3d 353, 376 (Pa. 2021) (*citing McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida*, 496 U.S. 18 (1990)) (internal quotation marks omitted). As noted, this conclusion is entirely contrary to *Sunburst*.[1] While the Constitution of this Commonwealth may require some form of remedy for violations of the Uniformity Clause, nothing in the United States Constitution does pursuant to the *Sunburst* doctrine. Thus, *General Motors*' conclusion can only be justified by an implicit assumption that *McKesson* overruled *Sunburst*. *See id*. (contending, without reference to *Sunburst*, that *McKesson*'s holding is not "restrict[ed] … to Commerce Clause violations but instead speaks broadly

---

[1] Moreover, even in the absence of *Sunburst*, I would conclude that *McKesson*'s remedy for a violation of the dormant interstate Commerce Clause is not a relevant consideration when evaluating a proposed remedy for a violation of the Uniformity Clause. The dormant Interstate Commerce Clause prohibits states from discriminating against out-of-state commercial interests in favor of in-state interests. *See id*. at 22-23; *see also Zilka v. Tax Review Bd. of City of Philadelphia*, 304 A.3d 1153, 1156 (Pa. 2023). Thus, an appropriate remedy for violating the dormant Interstate Commerce Clause requires placing the unfairly discriminated against business in a position equal to its in-state competitors. In contrast, as I discuss more fully below, the Uniformity Clause intends to ensure that the common tax burden is borne by all citizens. Therefore, the appropriate comparator is every Pennsylvania taxpayer, not just Alcatel's corporate peers. And the appropriate remedy is, to the extent reasonably possible, to ensure all taxpayers pay their fair share.

in terms of erroneous or unlawful tax collection and unconstitutional deprivations.") (citation, internal quotation marks, and brackets omitted).

This is not to say we are not required to provide a remedy, but rather that any such requirement must come from our own Constitution, or laws drawn from it. I conclude that our legislature has created a statutory right to a remedy for **overpayment** of taxes. *See* 72 P.S. § 10003.1. Therefore, any right to a monetary remedy pursuant to a Uniformity Clause violation requires the claimant establish they overpaid their taxes.

Further, the Uniformity Clause, like all parts of our Constitution, must be interpreted "in its popular sense, as understood by the people when they voted on its adoption." *Pa. Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911, 929 (Pa. 2017). As now-Chief Justice Todd explained in *Nextel*, the Uniformity Clause was the result of a populist revolt **against** the legislature:

> This provision was part of a larger package of constitutional provisions the people of the Commonwealth approved in adopting the "Reform Constitution" of 1874 for the purpose of altering certain legislative practices which had become commonplace during the 19th century, but which, by the latter part of that century, had fallen into serious disfavor with the populace, who rightly perceived that these practices were intended to advance private or personal interests at the expense of the public's welfare. The Uniformity Clause, the language of which has remained unchanged since its initial ratification by the voters, was a direct response to the legislative use of special tax laws applicable only to particular industries or individuals.
>
> The use of such special tax laws in Pennsylvania to favor particular industries began in the early part of the 19th century as part of a broader effort underway at the time by many state governments to foster "internal improvements" within their borders, *i.e.*, the construction of large physical transportation infrastructures such as canals, locks, dams, and ports on rivers to support the development of industries such as agriculture, coal mining, and timbering, and, later, as the Industrial Revolution came to America, iron and steel production. Although the Pennsylvania legislature directly financed many of these ventures for the benefit of private industries through bond issues which were repaid through tax dollars, it also provided indirect subsidies by bestowing upon these industries preferential tax treatment.

Most notably, a primary beneficiary of support from our Commonwealth's public fisc was the railroad industry, which received generous assistance from the General Assembly through the appropriation of funds for the construction of railroad lines, and the direct award of charters to individuals for the creation and exclusive operation of railroad companies in certain geographic areas. By the era of the Civil War, the railroad companies had acquired such influence over the Pennsylvania legislature that they routinely obtained the passage of special legislation advancing their interests. In the field of taxation, the railroads were particularly successful at securing special tax legislation through the efforts of their lobbyist Simon Cameron, who later became President Lincoln's Secretary of War, such that, in 1861, the legislature voted to exempt them entirely from taxation.

There was considerable popular anger generated by such preferential tax treatment, as it was perceived that the burdens of taxation, and its benefits, were not being equally shared. This anger fueled the clamor for a constitutional convention dedicated to constraining the power of the legislature to enact preferential local and special legislation, which the legislature ultimately acquiesced to by authorizing the constitutional convention of 1872–1873. The Uniformity Clause was, thus, the specific remedy fashioned by the delegates to that convention to eliminate the power of the legislature to enact special tax legislation, and its paramount purpose in requiring uniformity of taxation "was to prevent certain groups from having to shoulder the burden of progress from which all would benefit."

The language of the Uniformity Clause chosen by the framers of the 1874 Constitution requires uniformity of taxation on "the same class of subjects." It was unique in that it was the first such clause of any state constitution to require uniformity within classes of the subjects of taxation.

*Nextel Commc'ns of Mid-Atl., Inc. v. Commonwealth, Dep't of Revenue*, 171 A.3d 682, 694–695 (Pa. 2017) (citations and footnotes omitted).

The Uniformity Clause's purpose was to ensure no citizen was unfairly exempted from paying taxes. *General Motors*'s remedy wholly exempting General Motors from its obligation of paying taxes for 2001 is clearly contrary to that purpose.[2] Rather, the

---

[2] This is inarguably the result of *General Motors*. General Motors had approximately nine million dollars in income taxable in Pennsylvania in 2001, while it had over two hundred million dollars in available carried over net losses to apply in 2001. *See General Motors*, (continued…)

appropriate question was whether General Motors overpaid its tax obligation due to the Uniformity Clause violation. And, as *General Motors* itself conceded, General Motors did not overpay its 2001 taxes.

In most cases, as here, the purpose of the Uniformity Clause is arguably sufficiently served by the prospective invalidation of the offending statutory language. I agree with the Majority that the 2014 net loss carryover flat deduction should be (and, as a matter of fact, already has been) invalidated. Further, though the Majority does not explicitly reach the issue, I conclude that Alcatel did not overpay its 2014 taxes, and therefore, is due no monetary refund.

Nonetheless, I recognize that litigants such as Nextel, General Motors, and Alcatel are pursuing claims that hold our government accountable under the Constitution of Pennsylvania. The complete lack of a monetary refund or other remuneration for successful claimants would disincentivize this important public service. Ideally, the legislature should provide for some form of bounty under these circumstances. In the absence of any legislative action, I would adopt the "private attorney general" exception to the "American Rule" regarding reasonable attorneys' fees but limit the exception to only these specific circumstances. *Claremont School District v. Governor*, 761 A.2d 389, 392-393 (N.H. 1999). Parties that successfully establish Uniformity Clause violations but are unable to establish that they overpaid their taxes, should, at a minimum, be entitled to recover attorneys' fees from the government which was acting outside the law. I believe the Uniformity Clause is uniquely amenable to such an equitable rule due to the clause's genesis as a popular uprising against the legislature.

---

265 A.3d at 356. So, when this Court directed the Finance and Review Board "to recalculate GM's corporate net income tax without capping its NLC deduction and to issue a refund based upon that recalculation[,]" General Motors was refunded the entirety of its 2001 corporate income tax payments. *Id*. at 380.